The **HOOPA VALLEY TRIBE, a federally recognized Indian tribe, in its own behalf and in behalf of its enrolled members; the Hoopa Timber Corporation, a tribal enterprise of the Hoopa Valley Tribe, Plaintiffs,**

v.

Richard **NEVINS, Conway H. Collis, Ernest J. Dronenburg, Jr., Kenneth Cory, William M. Bennett, Members, State Board of Equalization; California State Board of Equalization; State of California, Defendants.**

No. C–82–5903–MHP.

United States District Court, N.D. California.

July 6, 1984.

As Amended July 19 and Aug. 23, 1984.

Robert L. Pirtle, James B. Weber, Ziontz, Pirtle, Morisset, Ernstoff & Chestnut, Seattle, Wash., Neil Shapiro, Cooper, White & Cooper, San Francisco, Cal., Garry J.D. Hubert, Kincaid, Gianunzio, Caudle & Hubert, Oakland, Cal., for plaintiffs.

Julian O. Standen, Deputy Atty. Gen., State of California, San Francisco, Cal., for defendants.

### OPINION

PATEL, District Judge.

### INTRODUCTION

This action is before the court on cross-motions for partial summary judgment. Oral argument was heard on the matter on March 5, 1984. After having considered all memoranda submitted by the parties and the arguments of counsel, the court concludes for the reasons set forth below that plaintiffs' motion for partial summary must be granted, and defendants' motion denied.

### FACTUAL BACKGROUND

Plaintiffs are the Hoopa Valley Tribe ("Tribe") and the Hoopa Timber Corporation ("HTC"), a wholly-owned enterprise of the Tribe. Defendants are the California State Board of Equalization ("Board"), five individual members of the Board, and the State of California. Plaintiffs challenge application of the timber yield tax and the timber reserve fund tax established by the 1976 California Forest Taxation Reform Act (Cal.Rev. & Tax.Code §§ 38101–38908), which are levied on "timber owners" against the value of timber at the time of harvest. Both taxes are referred to in this opinion as "the timber yield tax" or "the tax". The timber reserve fund tax was repealed in 1982. 1982 Cal.Stat., Ch. 1058.

Timber on the reservation is held in trust for the Tribe by the United States and is sold annually by the Bureau of Indian Affairs ("BIA") through competitive bidding. When HTC is the successful bidder it buys from BIA and after processing the timber sells to off-reservation companies. On its face the timber yield tax applies to private companies who buy directly from BIA. Cal.Rev. & Tax.Code § 38104 provides that "timber owner" includes "the first person who acquires either the legal title or beneficial title to timber after it has been felled from land owned by a federal agency or any other person or agency or entity exempt from property taxation under the Constitution or laws of the United States...." Defendants have not attempted to assess the tax directly against HTC or other Indian-owned firms when they are the successful bidders who purchase from BIA. However, the Board, which is charged with enforcing the tax, has ruled that the tax applies to purchases by private companies from HTC or other Indian-owned firms. A property tax rule has defined "timber owner" as "the first non-exempt person" who "acquires either the legal title or beneficial title to timber after it has been felled." Cal.Admin.Code Pub. Rev.R. 1026 (1980).

Plaintiffs challenge the application of the tax both to private companies who buy directly from BIA and to private companies who buy from HTC or other Indian-owned firms, on grounds of federal preemption and infringement of tribal sovereignty. Because the court concludes that the state tax is preempted by federal law, it does not reach the issue of tribal sovereignty.

### DISCUSSION

The parties agreed at oral argument that the analysis of this case must be guided by the Supreme Court's decision in *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665

(1980).[1] In *White Mountain* the court held that motor carrier and use fuel taxes imposed by Arizona on a non-Indian logging company operating on an Indian reservation were invalid because preempted by federal law. The Court determined that either preemption by federal law or infringement on tribal sovereignty could bar the application of state law to activity on the reservation or by tribal members. *Id.* at 142–43, 100 S.Ct. at 2582–83. Emphasizing that preemption standards which have been developed in other areas are unhelpful in analyzing preemption as it relates to Indian tribes, the Court called for "a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *Id.* at 145, 100 S.Ct. at 2584.

Using this as the framework, the Court then examined in detail the extent of the federal government's regulation of the harvesting of Indian timber and concluded that it was comprehensive, with the BIA exercising "literally daily supervision over the harvesting and management of tribal timber." *Id.* at 147, 100 S.Ct. at 2585. The Court also concluded that the federal government exercised detailed supervision over BIA roads on the reservation. Finding the federal regulatory scheme pervasive, the Court concluded that assessment of state taxes would obstruct federal policies and that defendants had identified no service performed by the state that would justify assessment of taxes for activities on BIA and tribal roads. *Id.* at 148–49, 100 S.Ct. at 2586–87.

The Court identified several ways in which the taxes would obstruct federal policy. First:

> At the most general level, the taxes would threaten the overriding federal objective of guaranteeing Indians that they will "receive ... the benefit of whatever profit [the forest] is capable of yielding ...." 25 C.F.R. § 141.3(a)(3) (1979). Underlying the federal regulatory program rests a policy of assuring that the profits derived from timber sales will inure to the benefit of the Tribe, subject only to administrative expenses incurred by the Federal Government.... The imposition of the taxes at issue would undermine that policy in a context in which the Federal Government has undertaken to regulate the most minute details of timber production and expressed a firm desire that the Tribe should retain the benefits derived from the harvesting and sale of reservation timber.

*Id.* at 149, 100 S.Ct. at 2586. Second, the Court found that "the taxes would undermine the Secretary's ability to make the wide range of determinations committed to his authority concerning the setting of fees and rates with respect to the harvesting and sale of tribal timber." *Id.* Finally, the Court concluded that "the imposition of state taxes would adversely affect the Tribe's ability to comply with the sustained-yield management policies imposed by federal law." *Id.* at 149–50, 100 S.Ct. at 2586–87. The Court noted, in concluding, that it was "undisputed that the economic burden of the asserted taxes will ultimately fall on the Tribe." *Id.* at 151, 100 S.Ct. at 2587.

The case before this Court bears many similarities to the situation in *White Moun-*

---

**1.** The court notes with some astonishment that defendants failed even to cite *White Mountain*, or any other case relied on by plaintiffs, in their moving papers. In view of the obvious relevance of *White Mountain* and the other cases, there is no excuse for defendants' attempt to skirt the issues they raise. Defendants' reliance in their moving papers on *Oklahoma Tax Commission v. Texas Co.*, 336 U.S. 342, 69 S.Ct. 561, 93 L.Ed. 721 (1949) is spurious. Not only was no Indian tribe a party in *Oklahoma Tax Com-*

*mission,* but the Court in no way considered Indian interests and in fact noted that there was no possibility the economic incidence of the tax could fall on the tribe. *Id.* at 353, 69 S.Ct. at 567. This 1949 case which did not even discuss the analysis to be applied when a state tax burdens an Indian tribe has no application to the case at bar and it and other cases cited by defendants obviously cannot insulate defendants from the analysis mandated by *White Mountain* and other recent cases.

*tain.* The taxes here were also imposed on non-Indian companies, the identical federal regulations governing the harvesting of Indian timber are implicated, and the effect of the tax is to diminish the profit the Tribe would otherwise gain from the sale of its timber.[2] Plaintiffs assert, and defendants do not deny, that the day-to-day supervision of tribal timber on the Hoopa reservation by BIA is just as, if not more, extensive than in *White Mountain.* For example, the BIA established minimum stumpage bid prices, and both the federal government and the Tribe expend large sums each year for timber management and timber sales administration. Defendants concede that neither the State of California nor Humboldt County exercises any regulatory jurisdiction or management over tribal timber and that they expend no unreimbursed funds on tribal timber. (Stipulation of Facts at 55–56.)

Applying the analysis mandated in *White Mountain,* this court must conduct a particularized inquiry into the state, federal, and tribal interests at stake. The federal and tribal interests at issue are identical to those in *White Mountain,* and the ways in which the state tax would obstruct federal policies is also the same. Defendants argue that the tax here does not fall under *White Mountain* because it is not a tax on activity conducted on the reservation, but rather is on ownership of felled timber once title has transferred to a non-Indian. This is a distinction without a difference; the nature of the federal and tribal interests remains the same, as does the existence of a comprehensive federal scheme of regulation with which the state tax interferes.[3]

In fact, the impact on the federal regulatory scheme is even greater here than in *White Mountain* because the tax at issue is assessed against the very subject of the regulations—the Indian timber harvested

on the reservation. Moreover, the value of the timber is produced entirely on the reservation. The Supreme Court has recently reaffirmed the importance of the concept that a tribe is entitled to the benefit, free of state taxation, of resources whose value is produced on the reservation. *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983); *see also Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 156–57, 100 S.Ct. 2069, 2590–91, 65 L.Ed.2d 10 (1980). The tax here implicates, as did the tax in *White Mountain,* the Tribe's right to " 'receive ... the benefit of whatever profit [the forest] is capable of yielding....' " *White Mountain,* 448 U.S. at 149, 100 S.Ct. at 2586, *quoting* 25 C.F.R. § 141.3(a)(3) (1979). The fact that the tax does not attach until the timber is sold to a non-Indian does not result in a different analysis.

The state has two possible interests in the tax at issue: a regulatory interest and a revenue interest. The regulatory intent of the statute is clear. The legislative policy underlying the statute included encouraging "prudent and responsible forest resource management calculated to serve the public's need for timber and other forest products, while giving consideration to the public's need for watershed protection, fisheries and wildlife, and recreational opportunities alike in this and future generations." Cal.Rev. & Tax.Code § 38101, Historical Note, Section 1(c) (West 1979). It is clear, however, that the state can have no interest in regulating tribal timber. Faced with a similar situation, in which the state of Montana attempted to impose upon non-Indians who mined coal from Indian trust land a tax with comparable regulatory purposes, the Ninth Circuit concluded that "[t]his coal is not the state's to regulate, and assertion of such authority diminishes

---

**2.** Defendants concede that the economic burden of the taxes falls at least in part on the Tribe, although the parties disagree as to the extent to which the burden is passed on to the Tribe. (Stipulation of Facts at 71–72.)

**3.** Defendants' arguments that *White Mountain* is inapplicable because the private companies upon whom the tax is directly assessed conduct

most of their business off the reservation and thus benefit from a full range of state and county services was rejected outright in *Ramah Navajo School Board, Inc. v. Bureau of Revenue of New Mexico,* 458 U.S. 832, 843–44 & n. 9, 102 S.Ct. 3394, 3401–02 & n. 9, 73 L.Ed.2d 1174 (1982), as defendants concede. There is thus no need for the court to address this argument.

the Tribe's own power to regulate. Such state action conflicts with the 1938 Act's purpose of allowing tribes to control the development of their mineral resources." *Crow Tribe of Indians v. Montana,* 650 F.2d 1104, 1114 (9th Cir.1981), *modified,* 665 F.2d 1390, *cert. denied,* 459 U.S. 916, 103 S.Ct. 230, 74 L.Ed.2d 182 (1982). Not only does the state have no legitimate regulatory interest in Indian timber, but the stated regulatory intent of the timber yield tax brings it into even greater conflict with the federal regulatory scheme than was the case in *White Mountain.* Imposition of the tax directly interferes with the comprehensive Federal timber management and timber sales administration.

The state's only real interest, then, is in collecting revenue. The justification proffered by the state for the burden imposed on the Tribe by this tax is that the state provides the Tribe with various valuable services. The Supreme Court has, however, made it clear what state benefits can justify a state tax burden on an Indian tribe. Such a burden will be upheld only if the tax revenue is used to aid the on-reservation activity which is being taxed.

The Supreme Court rejected precisely the same argument put forth by defendants here in *Ramah Navajo School Board, Inc. v. Bureau of Revenue of New Mexico,* 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982). In that case the Court struck down a tax imposed by the state on the gross receipts received by a non-Indian construction company from a tribal school board for the construction of a school for Indian children on the reservation. The Court wrote:

> We are similarly unpersuaded by the State's argument that the significant services it provides to the Ramah Navajo Indians justify the imposition of this tax. The State does not suggest that these benefits are in any way related to the construction of schools on Indian land. Furthermore, the evidence introduced below by the State on this issue is far from

clear. Although the State does provide services to the Ramah Navajo Indians, it receives federal funds for providing some of these services, and the State conceded at trial that it saves approximately $380,000 by not having to provide education for the Ramah Navajo children.

458 U.S. at 845 n. 10, 102 S.Ct. at 3402 n. 10.

Defendants' argument that the state in *Ramah Navajo* merely failed to prove that it provided significant services to the Indians is contradicted by the Supreme Court's subsequent decision in *New Mexico v. Mescalero Apache Tribe,* 462 U.S. ____, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983). There the Court, in enjoining the state from enforcing state game laws against non-Indians for acts done on the reservation, observed that the state had identified "no services it has performed in connection with hunting and fishing by nonmembers" which would justify a game license tax. The Court concluded that the state's "general desire to obtain revenues is simply inadequate to justify the assertion of concurrent jurisdiction in this case." 462 U.S. ____, 103 S.Ct. at 2391.

Finally, the Ninth Circuit had come to the same conclusion even earlier. In *Crow Tribe v. Montana,* involving a state attempt to tax coal mined from Indian trust land, as discussed above, the court considered that one main purpose of the tax at issue was to preserve the value of the coal for future generations. In rejecting the state's attempt to impose a tax, the court concluded: "To the extent that this tax is not related to the actual governmental costs associated with the mining of the Indian coal, ... the state's interest in acquiring revenues is weak in comparison with the Tribe's right to the bounty from its own land." 650 F.2d at 1117 (cites omitted).[4]

---

**4.** Defendants' attempt to rely on *Crow Tribe* to support their own position is misplaced. The court's remark that "[a] tax carefully tailored to effectuate the state's legitimate interests might survive," 650 F.2d at 1114, was made in the context of detailed examples given by the court of governmental costs associated with the mining itself, which the state could have perhaps tried to recover through a tax tailored to *those costs.*

In light of the Supreme Court's statements in *Ramah Navajo* and *Mescalero Apache Tribe,* and the Ninth Circuit's opinion in *Crow Tribe,* defendants cannot rely on general services provided to the Tribe to justify this tax.[5] Revenues from the timber yield tax go into a general fund and in no way support development of Indian timber. As noted above, the state has stipulated that it expends no reimbursed state funds with respect to timber or timber lands inside the reservation. Thus, the state's general interest in collecting revenue is insufficient when weighed against the federal and tribal interests at stake, under the *White Mountain* analysis.[6]

CONCLUSION

Having conducted the particularized inquiry into the nature of the state, federal, and tribal interests at stake as prescribed by the Supreme Court, the court finds that the exercise of state authority in assessing the timber yield tax against companies which purchase Tribal timber from BIA or from HTC or other Indian-owned firms is preempted by the pervasive federal regulation of Indian timber and is thus in violation of federal law.

Accordingly,

IT IS ORDERED that plaintiffs' motion for partial summary judgment be GRANTED and that defendants' motion for partial summary judgment be DENIED.

IT IS FURTHER ORDERED that the parties shall submit within thirty (30) days a joint statement as to the issues which remain to be resolved and how they intend to proceed with respect to any remaining issues. A status conference will be held in this matter on August 27 at 9:30 A.M.

ORDER

Plaintiffs and defendants in this action have proposed certain changes to the opinion issued by this court on July 6, 1984. Defendants have not opposed plaintiffs' proposed changes, all of which relate to technical points and make no substantive changes in the opinion.

Defendants also propose two changes. They first propose that on p. 199, line 45, the words "The parties agreed at oral argument that" be deleted. The court has compared its own recollection with the transcript as read back by the reporter and finds that defendants' counsel stated at oral argument: "We will accept that the *Bracker* and *White Mountain* [sic] is the analysis that applies." The court therefore finds it inappropriate to modify the opinion in this respect.

Defendants' second proposed change is to delete the first two sentences of footnote 1, on page 200. Because the court found it clear that the case must be governed by *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980), and further determined that the three Ninth Circuit decisions which defendants complain were not cited by plaintiffs were inapposite, it finds it inappropriate to modify the opinion in this respect, as well.

For these reasons, both of defendants' proposed changes are DENIED.

Defendants have further requested that the court certify this matter for an interloc-

5. Defendants argue that the Supreme Court in *White Mountain* "accepted" the state's taxation of the use of state highways within the reservation, and that because those tax revenues were not used to develop Indian timber, taxes on any on-reservation activity must be acceptable if other general services are provided. The short response to this argument is that the Supreme Court in *White Mountain* never addressed the state's taxation of state highway use at all. The Court clearly stated that for purposes of that action petitioners had conceded liability for taxes attributable to use of state highways within the reservation. 448 U.S. at 140 n. 6, 100 S.Ct. at 2582 n. 6. Those taxes were never challenged and were never at issue. No inference can be drawn from a matter which was not before the Court.

6. The court notes defendants' argument that the county will have no incentive to provide services to the Tribe if the Tribe does not sufficiently contribute to revenues is contrary to a line of California cases beginning with *Serrano v. Priest,* 18 Cal.3d 728, 135 Cal.Rptr. 345, 557 P.2d 929 (1976). In light of the court's conclusion based on *White Mountain* and subsequent cases, the court need not reach this issue.

utory appeal. However, the requirements for such certification under 28 U.S.C. § 1292(b) include that the district court "shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion...." The court being of the opinion that the legal issues in this matter are clear and that there is not substantial ground for difference of opinion, the request that the court certify for interlocutory appeal is DENIED.

IT IS SO ORDERED.