881 F.2d 657
 The HOOPA VALLEY TRIBE, a federally recognized Indian tribe
on its own behalf and on behalf of its enrolled members, and
Hoopa Valley Timber Corporation, a tribal enterprise of the
Hoopa Valley Tribe, Plaintiffs/Appellees/Cross-Appellants,
v.
Richard NEVINS, Conway H. Collin, Ernest J. Dronenburg,
William F. Bennett, and Kenneth Cory, as members of the
California State Board of Equalization; California State
Board of Equalization; and State of California,
Defendants/Appellants/Cross-Appellees.
 Nos. 88-1560, 88-1662.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 8, 1989.
Decided July 28, 1989.
 
 Julian O. Standen, Deputy Atty. Gen., State of Cal., Dept. of Justice, San Francisco, Cal., for defendants/appellants/cross-appellees.
 Terence L. Thatcher, Pirtle, Morisset, Schlosser & Ayer, Seattle, Wash., for plaintiffs/appellees/cross-appellants.
 Appeal from the United States District Court for the Northern District of California.
 Before FARRIS, THOMPSON and TROTT, Circuit Judges.
 FARRIS, Circuit Judge:
 
 
 1
 The California State Board of Equalization appeals the district court's grant of summary judgment in favor of the Hoopa Valley Tribe. The district court held that federal law preempts the imposition of the California timber yield tax, Cal.Rev. & Tax Code part 18.5, on the harvest by non-Indian purchasers of timber owned by the tribe. The Hoopa Valley Tribe appeals the district court's denial of its motion for attorney's fees. We affirm both determinations.
 
 BACKGROUND
 A. The Tribe
 
 2
 The Hoopa Valley Indian Reservation, the ancestral home of the Hoopa Valley Tribe, was established in 1864 and is the largest and most populous in California. See 8 Smithsonian Institution, Handbook of North American Indians 164-76 (W. Sturtevant ed. 1978); 1 Kappler 815 (1904) (executive orders); 13 Stat. 39 (1864). The reservation is located in Humboldt County, approximately 60 miles northeast of Eureka between the Coast Ranges and the Salmon-Trinity Alps Wilderness Area. This litigation concerns the portion of the reservation known as "the Square," an area approximately 12 miles on a side containing prime timber lands of pine, cedar, and Douglas fir. See Handbook, supra, at 176. Out of the 88,666 acres in the Square, title to 85,430 acres is held in trust for the tribe by the United States. Virtually all of that land is commercial timber land. An additional 600 acres of privately-owned land within the Square contains commercial timber. Id.
 
 
 3
 The remoteness of the reservation and the destruction of fish resources in the Klamath-Trinity River system limit tribal employment opportunities to the timber industry. The tribe relies almost exclusively on timber-related revenues for supporting the tribal budget. See id. The tribe established the Hoopa Timber Corp. in 1976 to improve the tribe's economic return from tribal timber resources. The corporation is neither a tribal nor a state corporation. Instead, it is a wholly-owned subordinate organization of the tribe, established under Art. IX, Sec. 1(p) of the tribal constitution. Management of tribal timber is provided by staff of the U.S. Bureau of Indian Affairs. See 25 C.F.R. part 163. The BIA sells tribal timber by competitive bidding to both the Hoopa Valley Timber Corp., which in turn processes the timber and sells it to off-reservation companies, and to private companies. Standard timber industry practice is for the timber owner to bear the economic burden of timber taxes imposed on timber purchasers.
 
 
 4
 The population of the Hoopa Valley Reservation is approximately 60% Indian and 40% non-Indian. The tribe has approximately 1,650 members. The tribe, county, state, and federal government all fund public services for the reservation. The state maintains State Highway No. 96, the principal route to and through the reservation, which also serves several towns to the north of the reservation. The tribe and the Bureau of Indian Affairs fund fire protection, education, public utilities, subsidized housing, recreational, and economic development programs and maintain 427 miles of local roads. The state and the tribe share the costs of local law enforcement. Welfare and health care costs are shared by the state, the federal government, and the tribe.
 
 B. The Tax
 
 5
 In California, all real property, with certain exceptions, is subject to an ad valorem property tax. Cal. Const. art. XIII, Sec. 1; see also Cal.Rev. p Tax Code Sec. 104. To promote sound timber management, conservation, and production, in 1976 the state modified the ad valorem tax as it applied to timber and replaced it with a yield and reserves tax, collectively known as the timber yield tax. Cal.Rev. & Tax Code Secs. 38101-38908 (timber reserves tax repealed by 1982 Cal.Stat., Ch. 1058); see generally W. Unkel & D. Cromwell, California's Timber Yield Tax, 6 Ecology L.Q. 831 (1978). The yield tax is assessed at the time of harvest on the value of timber at the time of harvest and is imposed on the first entity to acquire ownership of felled timber. Cal.Rev. & Tax Code Sec. 38104-38110. If the first owner is exempt from taxation, the timber yield tax is due from the first non-exempt person to acquire legal or beneficial title to the timber. Sec. 38104; Cal.Adm.Code Pub.Rev.R. 1026.
 
 C. Procedural History
 
 6
 The tribe filed suit in October 1982, challenging the application of the tax both to private companies who purchase tribal timber directly from the BIA and to private companies who buy from Hoopa Timber Corp. or other Indian-owned firms. The district court granted partial summary judgment to the tribe on the grounds of federal preemption.[1] Hoopa Valley Tribe v. Nevins, 590 F.Supp. 198, 199 (N.D.Cal.1984). The court did not address the tribe's alternative argument, that the tax was invalid because it infringed tribal sovereignty. Id. On December 30, 1987, the district court entered final judgment, awarding the tribe $368,659.15 in damages, the stipulated total of timber taxes on tribal timber collected by the state from 1977-82, and $249,016.32 in pre-judgment interest.
 
 DISCUSSION
 
 7
 The district court had jurisdiction under 28 U.S.C. Secs. 1331 and 1362. We have jurisdiction under 28 U.S.C. Sec. 1291. The federal jurisdictional barrier to suits challenging state taxes imposed by 28 U.S.C. Sec. 1341 does not bar such suits by Indian tribes. Moe v. Salish and Kootenai Tribes, 425 U.S. 463, 470-75, 96 S.Ct. 1634, 1639-42, 48 L.Ed.2d 96 (1976).
 
 
 8
 We review de novo the district court's grant of summary judgment. Harkins Amusement Enter v. General Cinema Corp., 850 F.2d 477, 482 (9th Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 817, 102 L.Ed.2d 806 (1989). We review the district court's denial of attorney's fees under Sec. 1988 for abuse of discretion; however, we review de novo the legal principles the district court relied upon for its decision. Lewis v. Anderson, 692 F.2d 1267, 1269 (9th Cir.1982).
 
 A. Validity of the Tax
 
 9
 The district court found "that the exercise of state authority in assessing the timber yield tax against companies which purchase Tribal timber from BIA or from HTC or other Indian-owned firms is preempted by the pervasive federal regulation of Indian timber and is thus in violation of federal law." Hoopa Valley, 590 F.Supp. at 203. On appeal, California argues that its interest in imposing the tax outweighs the federal and tribal interests at issue.
 
 
 10
 Preemption analysis in Indian tribal cases "requires a particularized examination of the relevant state, federal, and tribal interests." Cotton Petroleum Corp. v. New Mexico, --- U.S. ----, 109 S.Ct. 1698, 1707, 104 L.Ed.2d 209 (1989) (quoting Ramah Navajo School Board v. Bureau of Revenue, 458 U.S. 832, 838, 102 S.Ct. 3394, 3398, 73 L.Ed.2d 1174 (1982)). The question of whether federal law, which reflects related federal and tribal interests, preempts state activity is not controlled by the standards of preemption developed in other areas. Id. Ambiguities in federal law are to be construed generously in favor of the tribe; no specific congressional intention to preempt state activity is required. Id.; White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 142-43, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980); accord Crow Tribe of Indians v. Montana, 819 F.2d 895, 898 (9th Cir.1987), aff'd, --- U.S. ----, 108 S.Ct. 685, 98 L.Ed.2d 638 (1988). If the state law interferes with the purpose or operation of a federal policy regarding tribal interests, it is preempted. Crow Tribe, 819 F.2d at 898.
 
 
 11
 Indian lands are exempt from state real property taxes. The Kansas Indians, 72 U.S. (5 Wall.) 737, 18 L.Ed. 667 (1866); see McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 169-71, 93 S.Ct. 1257, 1260-62, 36 L.Ed.2d 129 (1973). Federal policy encourages the economic development of tribal lands. White Mountain, 448 U.S. at 143, 100 S.Ct. at 2583. Federal laws and policies comprehensively support and regulate the harvest of timber on tribal lands. Id. at 145-49, 100 S.Ct. at 2584-87.
 
 
 12
 State taxes or regulations that interfere with tribal activities may be preempted if the tribal activity the state seeks to affect involves goods produced on the reservation. Compare Washington v. Confederated Tribes of Colville Indian Reservation, 447 U.S. 134, 155, 100 S.Ct. 2069, 2082, 65 L.Ed.2d 10 (1980) (upholding state tax on on-reservation sales of cigarettes to non-Indians because product obtained off-reservation) with California v. Cabazon Band of Mission Indians, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) (state regulation of bingo games preempted because tribe was generating value on reservation through activities in which tribe had strong interest). In White Mountain, Arizona applied its motor carrier license and fuel taxes to the equipment and activities of a private contractor hired by the tribe to assist in harvesting timber on reservation lands. 448 U.S. at 139-40, 100 S.Ct. at 2581. The Court found those taxes preempted because they undermined the federal policy of assuring that timber sale profits inure to the tribe. Id. at 148-49, 100 S.Ct. at 2586. In Ramah, New Mexico imposed a tax on the gross receipts that a non-Indian construction company received from a tribal school board for the construction of a school for Indian children on the reservation. 458 U.S. at 834, 102 S.Ct. at 3396. Although the tax was paid by a private company, the Court found the tax preempted because it burdened the comprehensive federal scheme regulating education for Indian children. Id. at 845, 102 S.Ct. at 3402.
 
 
 13
 In Crow Tribe, we invalidated Montana's coal severance tax as applied to coal mined from tribal lands because the tax had a financial impact on tribal resource development activities. 819 F.2d at 899-900. Montana argued that its severance tax on coal did not burden the tribe's economic interests because the tax was imposed on the tribe's lessee, a private company, and not the tribe. 819 F.2d at 899. We rejected the argument because the taxes ultimately reduced the royalty received by the tribe.[2] Id.
 
 
 14
 In Cotton Petroleum the Court reaffirmed the basic principles of White Mountain and Ramah while holding that New Mexico could impose its oil and gas severance tax on the production of oil and gas by non-Indians from tribal lands. 109 S.Ct. at 1711-13. The Court distinguished White Mountain and Ramah by recognizing that New Mexico regulated the oil and gas activities affected by the tax. Cotton, 109 S.Ct. at 1712. Additionally, the Court noted that the New Mexico tax primarily burdened non-Indian taxpayers. Cotton, 109 S.Ct. at 1712-13 & n. 18. "This is not a case in which the State has had nothing to do with the on-reservation activity, save tax it. Nor is this a case in which an unusually large state tax has imposed a substantial burden on the tribe." Cotton, 109 S.Ct. at 1713. The Court also noted that it had no reason to reexamine its summary affirmance of our decision in Crow Tribe, because the Montana tax "had a negative effect on the marketability of coal produced in Montana." 109 S.Ct. at 1713 n. 17. In contrast to New Mexico's regulation of oil and gas in Cotton, California plays no role in the Hoopa Valley Tribe's timber activities. Hoopa, 590 F.Supp. at 201-02. Also unlike Cotton, the burden of the tax concededly falls on the tribe. Hoopa, 590 F.Supp. at 201 n. 2.
 
 
 15
 The state argues that the district court erred because its interest in imposing the tax is much stronger than Arizona's interest in White Mountain. The state points out that in White Mountain, Arizona imposed motor vehicle taxes on entities that used reservation roads maintained by the BIA and not the state. Here, California notes that the timber tax helps fund various services used by tribal members, and that the services provided by the state to tribal members far exceed the income from the timber tax.
 
 
 16
 The district court correctly determined that the state's interest was not strong enough to outweigh the substantial federal and tribal interests in timber harvesting on the reservation. The Supreme Court rejected a parallel argument in Ramah: "We are similarly unpersuaded by the State's argument that the significant services it provides to the Ramah Navajo Indians justify the imposition of this tax. The State does not suggest these benefits are in any way related to the construction of schools on Indian land." 458 U.S. at 845 n. 10, 102 S.Ct. at 3402 n. 10; see also White Mountain, 448 U.S. at 150, 100 S.Ct. at 2587. ("We do not believe that respondents' generalized interest in raising revenue is in this context sufficient to permit its proposed intrusion into the federal regulatory scheme with respect to the harvesting and sale of tribal timber."). Although California points to a variety of services that it provides to residents of the reservation and the surrounding area, none of those services is connected with the timber activities directly affected by the tax. To be valid, the California tax must bear some relationship to the activity being taxed. See Crow Tribe, 819 F.2d at 900. Showing that the tax serves legitimate state interests, such as raising revenues for services used by tribal residents and others, is not enough. Id. at 901. "To the extent that this [coal severance] tax is not related to the actual governmental costs associated with the mining of the Indian coal ... the state's interest in acquiring revenues is weak in comparison with the Tribe's right to the bounty from its own land." Crow Tribe v. Montana, 650 F.2d at 1117 (citations omitted).
 
 
 17
 The state's general interest in revenue collection is insufficient to outweigh the specific federal and tribal interests with which the timber yield tax interferes. The services provided by the state and county are provided to all residents. The road, law enforcement, welfare, and health care services provided by the state and county benefit both tribal and non-tribal members. California admits that there is no direct connection between revenues from the timber yield tax and the provision of services to tribal members or area residents generally.
 
 
 18
 The purpose of the timber yield tax bears no relationship to tribal timber. Prior to enactment of the timber yield tax, the state imposed an ad valorem tax on timber. Tribal timber was not subject to the tax. Recognition of the disincentives to proper timber management created by the ad valorem tax led to the enactment of the timber yield tax. See Unkel & Cromwell, supra, at 832-38. Those concerns were not relevant to tribal timber, because that timber was not subject to the ad valorem tax and was managed under detailed guidelines by the BIA. See Comment, Challenging the Assessment of the California's Timber Yield Tax Against Purchasers of Indian Timber, 13 Pac.L.J. 1325, 1327-30 (1982).
 
 
 19
 Because the timber yield tax does not fund services that directly relate to the harvesting of tribal timber and is otherwise unconnected with tribal timber activities, the timber yield tax should be preempted.
 
 B. Attorney's Fees
 
 20
 A more difficult question is posed by the tribe's request for attorney's fees under 42 U.S.C. Sec. 1988. The district court's decision was based on a preemption analysis, which this court has held is outside the scope of 42 U.S.C. Sec. 1983 and therefore incapable of supporting an award of attorney's fees under Sec. 1988. See White Mountain Apache Tribe v. Williams, 810 F.2d 844, 848-52 (9th Cir.), cert. denied, 479 U.S. 1060, 107 S.Ct. 940, 93 L.Ed.2d 990 (1987); accord Central Machinery v. Arizona, 152 Ariz. 134, 730 P.2d 843, 853-54 (1986), cert. denied, 481 U.S. 1042, 107 S.Ct. 1984, 95 L.Ed.2d 823 (1987). Section 1988 fees may be awarded to a prevailing party if that party presented a substantial unadjudicated claim within the scope of Sec. 1983 that was not alleged solely to support the fee award. Maher v. Gagne, 448 U.S. 122, 130-33, 100 S.Ct. 2570, 2575-77, 65 L.Ed.2d 653 (1980). The tribe argues that its claim for infringement of its right to tribal self-government is within the scope of Sec. 1983 and therefore entitles it to attorney's fees.[3] The right to self-government qualifies as a substantial claim, because this court has recognized the right of tribal self-government as an independent basis for finding a state tax invalid. Crow Tribe, 819 F.2d at 902-03. The district court held that the tribe's right to self-government "preceded, and therefore is not secured by, any federal statute or the Constitution ... and therefore is not cognizable under section 1983."
 
 
 21
 No reported decision settles the issue by determining whether the alleged infringement of the right to tribal self-government is a "deprivation of any rights, privileges or immunities secured by the Constitution or laws." 42 U.S.C. Sec. 1983. Instead, we must analyze whether the right to tribal self-government is within the scope of Sec. 1983. Some federal statutes, as well as constitutional provisions, create rights enforceable by Sec. 1983. See Maine v. Thiboutot, 448 U.S. 1, 4-8, 100 S.Ct. 2502, 2504-06, 65 L.Ed.2d 555 (1980) (scope of Sec. 1983 encompasses violations of federal statutes); Ramah Navajo School Board v. Bureau of Revenue, 104 N.M. 302, 720 P.2d 1243 (App.), cert. denied, 479 U.S. 940, 107 S.Ct. 423, 93 L.Ed.2d 373 (1986) (Indian Self-Determination and Educational Assistance Act created right cognizable under Sec. 1983).
 
 
 22
 The tribal right of self-government is not grounded specifically in the Constitution or federal statutes. See E. Mettler, A Unified Theory of Indian Tribal Sovereignty, 30 Hastings L.J. 189, 90-93 "The tribes do not have a constitutional right to maintain this [sovereign] status, nor do they have a constitutional right to exercise any powers or attributes of sovereignty." Id. at 135. Instead, the right to tribal self-government is protected by treaty and federal judicial decisions. Id. at 91-93. "[T]he Constitution does not require continuing recognition of tribes as governmental entities [and] the treaty clause has come to be the source of federal legislative power over Indian affairs." Id. at 93; see also F. Cohen, Handbook of Federal Indian Law 231-35 (1982).
 
 
 23
 In refusing to award Sec. 1988 fees for the preemption claim in White Mountain, this circuit stated that "Sec. 1983 was not intended to encompass those Constitutional provisions which allocate power between the state and federal government." White Mountain, 810 F.2d at 848. The question is whether the right to tribal self-government is one "that protects the individual against government intrusion." Id. In White Mountain, we distinguished power conferring provisions, such as the Supremacy Clause, from rights conferring provisions that protect the individual from government intrusion. Id.
 
 
 24
 Like the right to be free from state taxes preempted by federal law, the right to self-government is best characterized as a power, rather than a right. It enables a tribe to exercise powers as a sovereign, within the limitations provided by federal law. For example, tribes may determine their own form of government and membership, regulate hunting and fishing on reservations, regulate and tax resource development activities on tribal lands, decide criminal and civil disputes involving tribal members and civil disputes between tribal and non-tribal members. See Cohen, supra, at 246-57; L. Tribe, American Constitutional Law 1471 n. 29 (1988) (citing cases). The tribe is asserting its right to exercise sovereignty, as opposed to protecting the personal liberty of its members. See White Mountain, 810 F.2d at 848. Because the right to tribal government protects the powers conferred upon the tribe, and not individual rights, it falls outside the scope of Sec. 1983.[4]
 
 
 25
 The right to tribal self-government is protected in part by federal judicial decisions. The tribe argues that because the right to tribal self-government is found within federal common law it is within the scope of Sec. 1983. In support of that proposition, the tribe cites cases holding that 28 U.S.C. Sec. 1331, the federal jurisdiction statute, encompasses federal common law. The scope of Sec. 1983 does not parallel that of 28 U.S.C. Sec. 1331. See, e.g., Middlesex County Sewerage Authority v. National Sea Clammers Ass'n, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) (Sec. 1983 claim precluded if Congress includes within statutory scheme comprehensive remedial procedures); Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) ("bill of rights" provision of Developmentally Disabled Assistance and Bill of Rights Act essentially precatory and therefore unenforceable under Sec. 1983). Although Sec. 1983 is to be construed liberally, the tribe can point to no cases that support incorporating federal common law into its scope.
 
 
 26
 We understand, but reject, the tribe's argument that the Act of April 8, 1864, 13 Stat. 39, is a federal law within the scope of Sec. 1983. The Act merely authorized the creation of reservations in California and did not address the sovereignty or rights of Indians.[5]
 
 
 27
 The right to tribal self-government also is based on treaty. We previously have held that a suit based on the interpretation of treaty rights to take fish is not cognizable under Sec. 1983. United States v. Washington, 813 F.2d 1020 (9th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1593, 99 L.Ed.2d 908 (1988). The right to self-government may appear more akin to a Sec. 1983-type civil right than the right to take fish. Nonetheless, both rights are grounded in treaties, as opposed to specific federal statutes or the Constitution.
 
 CONCLUSION
 
 28
 We affirm the district court's determination that the assessment of the California timber yield tax against purchasers of tribal timber is preempted by federal law. We also affirm the district court's denial of Sec. 1988 attorney's fees to the tribe on the grounds that the tribe's claims were not cognizable under Sec. 1983.
 
 
 29
 AFFIRMED. Each party shall bear its own costs of appeal.
 
 
 
 [1]
 The tribe moved for partial summary judgment on its preemption and tribal sovereignty claims
 
 
 [2]
 Crow Tribe supports one of the key underpinnings of the district court's decision in this case. California argued that the tax should not be preeempted because it did not affect activity conducted on the reservation, but instead fell on ownership of cut timber once title transfered to a non-Indian. The district court noted that this is "a distinction without a difference." Hoopa Valley, 590 F.Supp. at 201
 
 
 [3]
 The right to tribal self-government claim was included in the complaint and briefed for the summary judgment motion. The tribe raises an additional claim, of tax immunity, that it argues is within the scope of Sec. 1983. This claim fails because the tribe admits it was not even briefed. Nor is the immunity claim distinct from preemption. See Mescalero Apache Tribe v. Jones, 411 U.S. 145, 149-55, 93 S.Ct. 1267, 1270-74, 36 L.Ed.2d 114 (1973)
 
 
 [4]
 The Supreme Court has characterized the right of tribal self-government as independent of but related to preeemption analysis. White Mountain, 448 U.S. at 143, 100 S.Ct. at 2583. The right of self-government also provides "an important 'backdrop' " to preeemption analysis. Id. (quoting McClanahan, 411 U.S. at 172, 93 S.Ct. at 1262). The Court has chosen not to ground its analyses of conflicts between state laws and tribal activities in the Constitution's Indian Commerce Clause, prefering to rely on the preeemption approach described above. Ramah, 458 U.S. at 845-46, 102 S.Ct. at 3402
 
 
 [5]
 In White Mountain, we held that the statutes regulating the harvest of tribal timber and federal policies concerning tribal timber development were not within the scope of Sec. 1983. 810 F.2d at 852