871 P.2d 1368

**BLAZE CONSTRUCTION CO., INC.,
an Oregon Corporation,
Plaintiff–Appellant,**

v.

**The TAXATION AND REVENUE DEPARTMENT OF the STATE OF NEW MEXICO, Defendant–Appellee.**

**BLAZE CONSTRUCTION CO., INC.,
an Oregon Corporation,
Plaintiff–Appellant,**

v.

**The TAXATION AND REVENUE DEPARTMENT OF the STATE OF NEW MEXICO, Gail Reese, Secretary of the Taxation and Revenue Department, and Gerald B. Richardson, Hearing Officer, Defendants–Appellees.**

No. 12120.

Court of Appeals of New Mexico.

Sept. 2, 1993.

Steven L. Tucker, Tucker Law Firm, P.C., Santa Fe, Gary Verburg, Margrave, Celmins & Verburg, P.C., Scottsdale, AZ, for plaintiff-appellant.

Frank D. Katz, Taxation and Revenue Dept., Santa Fe, for defendants-appellees.

## OPINION

CHAVEZ, Judge.

These cases present the question of whether the State of New Mexico, which played no role in the construction, maintenance, or regulation of certain roads built entirely on Indian reservations, may nevertheless impose gross receipts taxes upon the contractor who built the roads. We need not decide whether the contractor, an Indian entity owned by an Indian who is not a member of the tribes for whom the reservations were set aside, is automatically exempt from state taxation. We hold that the fact that the road construction was funded through the Bureau of Indian Affairs (BIA) and was administered by a contract between the BIA and the contractor, rather than between the tribes and the contractor, does not preclude application of a pre-emption analysis to the taxation question. Applying such an analysis to the facts of this case, we hold that the taxes in question may not be imposed by the State.

### FACTS

Blaze Construction Company Inc., (Blaze) is an Indian-owned company, whose owner is a member of the Blackfeet tribe. Blaze contracted with the BIA to build roads on the Jicarilla Reservation, Zia Pueblo, Laguna Pueblo, and Navajo Reservation. The roads were built on rights-of-way provided by each tribe or pueblo (for ease of reference, this opinion subsequently refers to the tribes and pueblos simply as tribes, and to the reservations and pueblos simply as reservations). The tribes were involved in planning the route of each road across tribal land, and provided water and base materials needed for the construction projects. Blaze was required to hire local reservation residents as laborers for each project, and each tribe provided the services of a labor office to give Blaze a pool of workers from which to draw

and to monitor compliance with tribal labor laws. Most of Blaze's employees for each project were Indians residing on the respective reservation upon which the road was being constructed. The State, on the other hand, did not attempt to identify any interest, either in the form of a planning function or regulatory responsibilities, in the construction projects or the roads themselves after they were built. The State did not license Blaze as a construction contractor.

### DISCUSSION

#### Blaze's Exemption from Taxation as an Indian–Owned Entity

Blaze contends that, since it is an Indian entity and the projects were performed solely on reservations, it is automatically exempt from state taxation. *See Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 475–81, 96 S.Ct. 1634, 1642–45, 48 L.Ed.2d 96 (1976); *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). Blaze argues that it does not matter that its owner was not a member of any of the tribes upon whose reservations the roads were constructed. The merits of this argument are doubtful. *See Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 161, 100 S.Ct. 2069, 2085, 65 L.Ed.2d 10 (1980); *Duro v. Reina,* 495 U.S. 676, 686–87, 110 S.Ct. 2053, 2060–61, 109 L.Ed.2d 693 (1990); *Oklahoma Tax Comm'n v. Sac and Fox Nation,* —— U.S. ——, ——, 113 S.Ct. 1985, 1990, 124 L.Ed.2d 30 (1993); *but see Fox v. Bureau of Revenue,* 87 N.M. 261, 531 P.2d 1234 (Ct.App.1975), *cert. denied,* 88 N.M. 318, 540 P.2d 248 (1975). Because of our disposition of the other issues in this appeal, however, we need not decide this point.

#### The Effect of BIA, Rather than Tribal, Involvement in the Contracts

■ The State argues that Blaze contracted with the BIA, not the tribes. Since federal government contractors may be subjected to state taxes, *see United States v. New Mexico,* 455. U.S. 720, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982), the State maintains that the tax on Blaze's activities was permissible and no pre-emption analysis need be performed. We disagree. The BIA may be a federal agency, but it is a federal agency that has a special relationship with the Indian tribes involved in this case. *See, e.g., White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 145–48, 100 S.Ct. 2578, 2584–86, 65 L.Ed.2d 665 (1980) (describing BIA involvement in tribal business enterprises such as logging). The BIA assists tribes in the performance of governmental functions, in the economic development of their lands, and in their attempts to maintain and enhance tribal sovereignty. In fact, the Supreme Court has specifically stated that for purposes of an Indian pre-emption analysis, there is no basis for distinguishing between roads maintained by a tribe and roads maintained by the BIA. *Id.* at 148 n. 14, 100 S.Ct. at 2586 n. 14.

We note also that, in describing and applying the test applicable to pre-emption cases such as this one, the Supreme Court has stated that an analysis of the state, tribal, and federal interests in the activity, not simply the state and tribal interests, is necessary. *Cotton Petroleum Corp. v. New Mexico,* 490 U.S. 163, 176, 109 S.Ct. 1698, 1707, 104 L.Ed.2d 209 (1989). Heavy federal involvement in an activity has been a factor weighing in favor of a finding of pre-emption, rather than against it. *See Ramah Navajo Sch. Bd. v. Bureau of Revenue,* 458 U.S. 832, 840–41, 102 S.Ct. 3394, 3399–3401, 73 L.Ed.2d 1174 (1982); *Bracker,* 448 U.S. at 146–48, 100 S.Ct. at 2585–86. The BIA's role here was to implement and execute road-building projects that improved or provided roads on Indian lands, using Indian labor as much as possible, in cooperation with the tribes involved. That role made the BIA a partner in the tribes' performance of the integral governmental functions of improving the transportation system and facilitating economic development. Under these circumstances, we hold that the fact that Blaze's contracts in this case were with the BIA, rather than the tribes, has no effect on the necessity for performing a pre-emption anal-

ysis, and that *United States v. New Mexico* is not applicable to this case.

## The Pre-emption Analysis

 In deciding whether state taxation of on-reservation activity has been pre-empted, we look primarily at congressional intent. *Cotton Petroleum*, 490 U.S. at 176, 109 S.Ct. at 1707. However, "the history of tribal sovereignty, serves as a necessary 'backdrop' to that process." *Id.* Pre-emption questions are not resolved by reference to standards of pre-emption that have developed in other areas of the law, and are not controlled by rigid conceptions of state or tribal sovereignty. *Id.* Instead, what is required is a "flexible pre-emption analysis sensitive to the particular facts and legislation involved", *id.*, and 'a particularized examination of the relevant state, federal, and tribal interests.' *Id.* In performing such an analysis we must take into account "both the broad policies that underlie the legislation and the history of tribal independence in the field at issue." *Id.* It is also important to note that ambiguities in federal law are ordinarily resolved in favor of tribal independence. *Id.* at 177, 109 S.Ct. at 1708.

 With these principles in mind, we examine the parties' contentions and the facts of this case. Blaze contends that federal legislation and regulations concerning construction of roads on Indian lands are so pervasive that they pre-empt any state intrusion into the process. Blaze directs our attention to the fact that the contracts at issue were let under the Indian Financing Act of 1974, 25 U.S.C. Sections 1451 to 1543 (1988). Blaze also points out that construction of roads such as these is governed by a comprehensive scheme of federal regulations contained in 25 C.F.R. Sections 170.1–170.19 (1992). The BIA is responsible for planning, designing, and constructing roads, and for recommending projects to the tribes. Sections 170.3, 170.4a. Tribal decisions concerning road-building priorities are subject to the BIA's approval. Section 170.4a. In addition, the BIA is required to hold public hearings prior to commencement of construction of any new route, and decisions concerning such projects may be appealed by interested parties. Sections 170.11, 170.19. The BIA is also required to conduct engineering and traffic analyses and determine appropriate speed and weight limits for roads maintained by the BIA. Section 170.8(b).

We agree that the Indian Financing Act and other federal statutes evince a federal interest in encouraging tribal self-sufficiency and promoting economic development. *See Cotton Petroleum*, 490 U.S. at 183 n. 14, 109 S.Ct. at 1711 n. 14. We also agree that federal regulatory involvement in road construction projects such as these is extensive. However, we understand the holding of *Cotton Petroleum* to be that general policies underlying federal legislation, and even extensive federal regulation concerning an activity, are not by themselves a sufficient basis for a finding of pre-emption. *See id.; id.* at 186, 109 S.Ct. at 1712. We are instead required to perform the particularized factual inquiry into the state, federal, and tribal interests mandated by *Cotton Petroleum*.

Blaze also argues that the Supreme Court, in *Bracker*, has already decided that federal involvement in the use of BIA roads is so all-encompassing that there is no room for application of a state tax. We note, however, that the Court in *Bracker* decided that federal and tribal interests concerning the tribe's logging activities, not the BIA roads themselves, were so strong as to pre-empt state taxation of the activities. *Bracker*, 448 U.S. at 148–49, 100 S.Ct. at 2586–87. *Bracker* is not, therefore, dispositive of the question presented by this appeal.

We turn now to the analysis of the relevant state, federal, and tribal interests in the construction activity performed by Blaze. In doing so, we are confronted immediately by the fact that the State has identified absolutely no interest in the activity, either through regulating it or by involvement in the process. The State had no part in planning the construction, played no role in selecting or licensing the contractor, did not

regulate any aspect of the construction, and will not maintain the roads or regulate their use. This is, then, a case in which the State "has had nothing to do with the on-reservation activity, save tax it." *Cotton Petroleum,* 490 U.S. at 186, 109 S.Ct. at 1713. The federal and tribal control over the projects has left the State with "no duties or responsibilities" concerning the construction. *Id.* at 185, 109 S.Ct. at 1712. Accordingly, it is extremely difficult for the State to justify the tax imposed on the activity. The lack of any state interest in on-reservation activity has been a crucial factor in decisions disallowing state taxation. *See Ramah,* 458 U.S. at 843, 102 S.Ct. at 3401; *Bracker,* 448 U.S. at 150, 100 S.Ct. at 2587; *Gila River Indian Community v. Waddell,* 967 F.2d 1404, 1412 (9th Cir.1992); *Hoopa Valley Tribe v. Nevins,* 881 F.2d 657, 661 (9th Cir.1989), *cert. denied,* 494 U.S. 1055, 110 S.Ct. 1523, 108 L.Ed.2d 763 (1990). Where a state has demonstrated a regulatory or other interest in the activity, however, courts have been willing to allow the tax to stand. *See, e.g., Cotton Petroleum,* 490 U.S. at 185–86, 109 S.Ct. at 1712–13; *Cabazon Band of Mission Indians v. California,* 788 F.Supp. 1513, 1519–20 (E.D.Cal. 1992).

Given that the applicable analytical framework requires an inquiry into the federal, state, and tribal interests, and given the principle of tribal sovereignty that forms a backdrop for the inquiry, these results make sense. Imposing a burden, in the form of taxation, on activity occurring solely on a tribe's reservation undeniably intrudes to some extent on the tribe's sovereignty. In order to justify such an intrusion, a state should be required to show some interest in the activity sought to be taxed, or the "state's interest" prong of the pre-emption test becomes meaningless. *Cf. Cotton Petroleum,* 490 U.S. at 184, 109 S.Ct. at 1711 (quoting, with approval, Justice Powell's concurring opinion in *Bracker,* 448 U.S. at 174, 100 S.Ct. at 2601: " 'The State has no interest in raising revenues from the use of Indian roads that cost it nothing and over which it exercises no control' ").

The State argues that it does not matter that it demonstrated no interest in the construction activity at issue in this case. According to the State, there was insufficient evidence that the taxes imposed on Blaze affected tribal or federal interests at all. The State rests its argument on the asserted lack of any evidence showing that these particular projects would not have been built if Blaze had included state taxes in its bids. This argument misses the mark. It cannot be contested that, if contractors such as Blaze are required to pay state taxes on their road-building activities, the cost per mile of building roads on reservations will increase. Where the cost per mile is higher, fewer roads or smaller portions of roads can be built or improved for the same amount of money. *See Ramah,* 458 U.S. at 842, 102 S.Ct. at 3401 (state taxation of contractor depletes funds available for constructing Indian schools). In addition, there is less money available with which to pay wages to tribal members working on the road projects. State taxation, therefore, indirectly places a burden on the federal and tribal interests in improving the transportation system on reservations and in fostering the economic well-being of tribal members.

We rely on these commonsense facts in determining that state taxation of projects such as these does interfere with the federal and tribal interests that are inherent in the construction of roads on reservations. *See Cotton Petroleum,* 490 U.S. at 186–87, 109 S.Ct. at 1712–13 (stating that it is reasonable to infer, even with a lack of evidence supporting such inference, that state severance taxes have at least a marginal effect on the demand for on-reservation leases and the value of those leases to the tribe). The amount of money made available by Congress for building such roads is not unlimited; to the extent that state taxes on contractors diminish the amount of money that can be spent on actual construction, the taxes constitute a burden on the federal and tribal interests at stake.

We acknowledge that the burden imposed on such interests by state taxation on the contractors is an indirect one, unlike a situation in which the tribe's own economic activity is being taxed. We also acknowledge that

similar indirect burdens were not sufficient to pre-empt the tax in *Cotton Petroleum*. In the *Cotton Petroleum* case, however, as we have pointed out, the state was able to demonstrate a regulatory interest in the activity being taxed, and that it provided services to the tribe and lessees. *Id.* at 185–86, 109 S.Ct. at 1712–13. In this case, the State identified no interest at all in the construction activity. That is a decisive difference between the facts of this case and those in *Cotton Petroleum*. This case concerns roads built entirely on Indian reservations, built entirely with federal funds and under federal supervision, with the cooperation and assistance of the tribes, with labor provided largely by the respective tribes, by a company operating almost exclusively on reservations, and with no involvement by the State whatsoever. Even though the impact on the tribes and federal government in cases such as this is in the form of increased costs rather than direct taxation, given the lack of any State interest in the road construction, that indirect impact is sufficient to disallow the imposition of taxes on projects such as these. *Cf. Hoopa Valley Tribe,* 881 F.2d at 660 n. 2 (burden of tax assessed on non-Indian purchasers of tribal lumber held to fall on tribe).

### CONCLUSION

Pursuant to the foregoing, we hold that the state taxes in question are pre-empted for the on-reservation activity involved in this case. Construction of roads is an integral governmental function that affects a tribe's economic development as well as the day-to-day lives of its members. Since the State could identify no interest in the construction activity, and the taxes burden federal and tribal interests by increasing the cost of road construction projects on reservations, the applicable pre-emption analysis precludes the State from taxing the activity. We therefore reverse the administrative decision allowing the State to impose the tax on Blaze.

**IT IS SO ORDERED.**

APODACA and HARTZ, JJ., concur.