SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

No. 87–1146.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 14, 1987.

Decided July 5, 1988.

Carmen D. Legato, with whom Vern R. Walker, Gary L. Kaplan and Helen E. Disenhaus, Washington, D.C., were on the brief, for petitioner.

Joshua Z. Rokach, Atty., F.E.R.C., with whom Catherine C. Cook, General Counsel and Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., were on the brief, for respondent.

Before D.H. GINSBURG and SENTELLE, Circuit Judges, and MARKEY,[*] Chief Judge, United States Court of Appeals for the Federal Circuit.

Opinion for the Court by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

The South Carolina Public Service Authority (SCPSA or the State) owns and operates a hydroelectric project on the Santee and Cooper Rivers near Charleston, South Carolina. The project, which is licensed by the respondent Federal Energy Regulatory Commission under the Federal Power Act, 16 U.S.C. § 791a *et seq.* (1982 & Supp. IV 1986), includes a 4.38 mile dam constructed of hydraulic fill and known as the Santee North dam. Although this dam met prevailing engineering standards when it was built in 1942, recent scientific study indicates that it could fail during an earthquake, thereby flooding the downstream area. Accordingly, when the project came up for relicensing, FERC imposed a number of conditions on its continued operation. SCPSA here challenges one of those conditions, *viz.* that the State agree to provide compensation for all foreseeable property damage caused by any seismically induced dam failure. We agree with the State that the licensing authority granted to the Commission under the Act does not include the power to displace existing state tort law with its own rules of liability for damages caused by licensees. Accordingly, we grant the petition for review and remand the case to the Commission for further proceedings.

## I. BACKGROUND

FERC relicensed the Santee–Cooper project in 1979, noting in the accompanying order that the stability of the project in the event of an earthquake was in doubt and therefore reserving the right to order any remedial measures or corrective procedures that might later be deemed necessary in order to ensure the safety of the facility.

*See* 7 FERC ¶ 61,148 at 61,234, 61,243 (May 9, 1979). Thereafter, SCPSA, the Commission, and a number of consultants began a joint investigation into the risks posed by the dam and the measures that could be taken to minimize them. They reached the following undisputed conclusions: because of its hydraulic fill construction, the Santee North dam would fail during an earthquake measuring 6.1 on the Richter scale. The Charleston area experiences an earthquake of this severity approximately once every 100 years. The potential for failure is inherent in the design of the dam, so that repairing it is not feasible. In order to eliminate the risk of failure during an earthquake, SCPSA would have to build a replacement dam, which would cost more than $500 million. *See* 36 FERC ¶ 61,061 at 61,130–32 (July 18, 1986).

A breach of the existing dam would result in flooding of the downstream area. Because the Santee River Valley below the dam is broad, flat, and densely vegetated, however, the inundation would advance at only two miles per hour, or about one half the average person's walking speed. *Id.* at 61,131. The area below the dam is sparsely populated. Between the dam and the community of Alvin (referred to by the parties as Area 1), there are 47 dwellings. The flood waters would reach only two of them in the first two hours after the breach. The rest would be affected within about 24 hours of the breach. From Alvin to the Atlantic Ocean (Area 2), there are 695 dwellings. The minimum warning time for the first-affected residents of Area 2 would be more than five times longer than the shortest warning time for those first affected in Area 1. The flood would cause an estimated $12.1 million of property damage.

Relying primarily upon these findings, SCPSA proposed to FERC that the agency adopt a Comprehensive Emergency Action Plan (EAP) designed to protect the safety of the Santee Valley residents in the event of an earthquake-induced flood. Under the plan, SCPSA would install tone alert radio receivers in dwellings in the flood plain,

---

[*] Sitting by designation pursuant to 28 U.S.C. § 291(a).

notify all potentially affected occupants how to proceed in the event of an earthquake, and coordinate evacuation procedures with local disaster preparedness agencies. FERC held a public hearing on SCPSA's proposal, and received a single written comment, this from the owner of 8100 acres of timber land in the flood plain, inquiring about the State's liability for property damage in the earthquake-breach-flood scenario.

FERC approved SCPSA's EAP with several modifications. *See id.* at 61,140. First the Commission noted that it had four options: it could (1) do nothing; (2) require SCPSA to remove the dam; (3) require that the dam be replaced; or (4) adopt the "non-structural" approach represented by SCPSA's proposed EAP. The Commission dismissed the option of doing nothing as inconsistent with its responsibility under the Act to protect life, health, and property. It rejected the removal option because "the economy of the project area is, to a considerable degree, dependent upon the continued existence of the project." As for requiring SCPSA to build a new dam, the Commission noted that while repair or replacement is the presumed remedy for an unsafe structure, a less radical remedy was sufficient in the "unique circumstances" of this case. In particular, the slow velocity of the flood waters, the low population density of the flood plain, and SCPSA's ability to minimize any possibility of personal injury and loss of life by means of the proposed EAP warranted comparison of the cost of replacement against the adverse impacts of failure. Since the cost of replacement was approximately nine times the value of all expected losses from the flood, the Commission concluded that a comprehensive EAP would best serve the public interest.

The Commission determined that SCPSA's plan, with several modifications, adequately protected human life and health

from reasonably foreseeable seismic risks. The plan would not necessarily protect downstream owners from flood damage to their property, however. The Commission therefore concluded:

> In approving this non-structural alternative to reconstructing the North Dam, we believe it fair and equitable that SCPSA be required to compensate all those whose property is damaged as a result of a dam failure that could have been avoided by reconstruction to meet the design earthquake.... It is central to the acceptability of this non-structural approach that SCPSA, which is being spared the cost of dam reconstruction, will bear the cost of any foreseeable seismically-induced dam failure.

*Id.* at 61,134. The Commission implemented this view in Paragraph (F) of its order as follows: "In the event of a failure of the North Dam due to a seismic event equal to or less than the design earthquake (7.5 on the Richter scale) ... SCPSA shall provide for compensation for all foreseeable property damage proximately caused by the dam failure." Acting Chairman Sousa dissented on the ground that "a license condition requiring SCPSA to compensate property owners for damages caused by dam failure [is] a usurpation of authority left to the states by Congress, beyond the Commission's authority." *Id.* at 61,143.[1]

SCPSA requested rehearing, challenging the legal basis for the compensation requirement (along with other modifications to its EAP that are not at issue here). The Commission replied in its order denying rehearing:

> ... The Commission's approval of SCPSA's application for this amendment of its license, as well as its imposition of certain conditions to that approval, including the imposition of the liability at issue, was grounded in its broad authority and responsibility under Section 10(a)(1) of the FPA to ensure that the

1. Commissioner Sousa also suggested that the condition was unwise as a matter of policy because it might encourage unwise development downstream of the dam, with SCPSA in effect providing potential investors with "free flood insurance." He also suggested that because the

court system would still be called upon to adjudicate disputes over foreseeability and proximate cause, "the related question of whether a cause of action exists under state or Federal law should be heard in the same forum at the same time." *Id.* at 61,144.

licensed project, and its operation, is best adapted to a comprehensive plan for the use of a waterway for beneficial public uses.

The non-structural approach adopted while adequately ensuring protection of the public life and health, did not remove the risk to property from a seismically-induced dam failure. Since this risk to property would not be present had we ordered reconstruction of the dam to meet the design earthquake, we concluded that it was fair and equitable to require SCPSA to compensate all those whose property is damaged as a result of the dam failure as a condition to the continued operation of the project without reconstruction of the North Dam. Consequently, we included [the compensation requirement] as a condition of our approval of the EAP. However, licenses may be amended only upon mutual agreement between the licensee and the Commission. Consequently, SCPSA may choose between the EAP as conditioned and the replacement of the North Dam.

38 FERC ¶ 61,137, at 61,366–67. SCPSA petitioned for review in this court, which has jurisdiction pursuant to 16 U.S.C. § 825*l* (b).

## II. ANALYSIS

■ The question before us is one of first impression: Did the Commission exceed its authority under the Act when it conditioned the renewal of the Santee-Cooper license upon SCPSA's acceptance of strict liability for all property damage caused by an earthquake-induced flood?

We note first the standard by which we review the Commission's order, which the agency contends is authorized by the licensing provisions of the Federal Power Act. In *NLRB v. United Food and Commercial Workers Union*, — U.S. —, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987), the Supreme Court recently adumbrated the approach we are to take when we review

an agency's interpretation of its own organic statute:

On a pure question of statutory construction, our first job is to try to determine congressional intent, using "traditional tools of statutory construction." If we can do so, then that interpretation must be given effect, and the regulations at issue must be fully consistent with it. [*INS v. Cardoza–Fonseca*, 480 U.S. 421] at ___-___ [107 S.Ct. 1207, 94 L.Ed.2d 434]. See also *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, and n. 9 [104 S.Ct. 2778, 2781–82, and n. 9, 81 L.Ed.2d 694] (1984). However, where "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*, at 843 [104 S.Ct. at 2782].

*Id.* at 421. We therefore turn to the language and to the history of the Federal Power Act, respectively, in order to do "our first job" of determining Congress's intent, if we can, regarding the agency's conditional licensing authority.

### A.

■ Subchapter I of the Federal Power Act was intended to promote the navigation of the nation's rivers and the development of hydroelectric power. *See* 16 U.S.C. § 797(e); subpart II.B *infra* (discussing the legislative history). To these ends, the Act authorizes the Commission to issue licenses to private parties, or to state or local governments, "for the purpose of constructing, operating, and maintaining dams" and other project works.[2] 16 U.S.C. § 797(e). The Act does not require, however, that the Commission issue a license to every project that promises to advance the goals of navigation and power development. Instead, § 10(a) of the Act, 16 U.S.C. § 803(a) (Supp. IV 1986), makes it a condition of each license that the project "shall be such as in the judgment of the

---

2. The licensing powers granted to the Federal Power Commission under the Act were transferred to the Federal Energy Regulatory Commission by § 402(a)(1)(A) of the Department of

Energy Organization Act, Pub.L. No. 95-91, 91 Stat. 584 (1977) (codified at 42 U.S.C. § 7172(a)(1)(A) (1982)).

Commission will be best adapted to a comprehensive plan for improving or developing a waterway" for commerce, water power, fish and wildlife, and "other beneficial public uses ..." If necessary to achieve such a plan, "the Commission shall have authority to require the modification of any project and of the plans and specifications of the project works before approval." *Id.* Licenses issued under the Act may also include "such further conditions, if any, as the Commission shall prescribe in conformity with this chapter." 16 U.S.C. § 799. In addition, § 10(c) of the Act, 16 U.S.C. § 803(c), requires each licensee to

> maintain the project works in a condition of repair adequate for the purposes of navigation and for the efficient operation of said works in the development and transmission of power, ... and [to] conform to such rules and regulations as the Commission may from time to time prescribe *for the protection of life, health, and property.* (Emphasis added.)

Relying primarily on §§ 10(a) and (c) of the Act, the Commission contends that it is authorized (indeed, obliged) to ensure that a project is safe before licensing, or relicensing, it. Thus far, we agree. The Act clearly contemplates that the Commission will obtain the modification of any proposal that constitutes a menace to, and will require licensees to take reasonable measures to protect, life, health and property. *See, e.g., Public Utility District No. 1 v. FPC,* 308 F.2d 318, 323 (D.C.Cir.1962).

■ The Commission argues further, however, that by requiring SCPSA to compensate its neighbors for property damage resulting from an earthquake cum flood, it has "simply condition[ed] a license with safety measures in a proper exercise of [this] statutory authority." We find this proposition considerably more troubling. This is apparently the first time an agency authorized to regulate in the interest of safety has interpreted that authority to support a compensation scheme. The

dearth of authority to support the Commission's interpretation, which equates "the protection of ... property" with "compensation for damage to property," is not surprising: "compensation" bears little resemblance to "protection" as those terms are used in ordinary language or in statutes regulating various hazards. Unlike a requirement that a licensee take a measure to prevent a loss from occurring, such as installing an alarm system or rebuilding a dam, the compensation condition does not contribute in any way to the protection of property. Instead, it merely substitutes the Commission's preferred rule of compensation for existing state law in the event that the earth should move and the dam give way. We do not believe that Congress intended such a result when it authorized the Commission to issue licenses and to condition those licenses upon conformity to "regulations ... for the protection of ... property." The impossibility of the Commission's position is manifest when one considers the linguistically necessary implication, namely, that it could also require compensation for death or disease in lieu of "protection of life [and] health."

The Commission's interpretation seems even less tenable when one considers that its unique brand of "protection" would oust the states of their traditional authority to determine the rules of liability in tort. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).[3] As the Supreme Court noted in *FTC v. Bunte Bros., Inc.,* 312 U.S. 349, 351, 61 S.Ct. 580, 582, 85 L.Ed. 881 (1941), "in ascertaining the scope of congressional legislation a due regard for a proper adjustment of the local and national interests in our federal scheme must always be in the background." Deference to these local interests requires that we decline to find in the Act "radiations beyond the obvious meaning or language unless otherwise the purpose of the Act would be defeated." *Id.*

---

3. The state's strong interest in avoiding the displacement of its laws governing property rights was noted by the Fifth Circuit, *en banc,* in *Georgia Power Co. v. Sanders,* 617 F.2d 1112 (1980). Relying, in part, on this interest in a

"traditional[ ] ... area of local concern," the court concluded that state law should be applied to determine the appropriate compensation in condemnation actions under the Federal Power Act.

Improbable and intrusive though it is, we might be willing to believe that Congress's silence permits the Commission the power it asserts here, i.e., the power to specify a federal rule of liability governing its licensees, if it were essential to achieving the goals of the Act. The Commission does not claim that much, however. Clearly, Congress did not charge the Commission with ensuring that downstream property owners are held harmless from all damage caused by its licensees; it intended that the Commission would so regulate that licensed projects would not pose an unreasonable danger to life, health, or property, i.e., would be reasonably safe. The Commission generally discharges this duty by imposing regulations designed to ensure that the project is constructed, maintained, and operated in an acceptable manner. Where no modification or regulation can ensure an adequate level of safety, however, the Commission may decline to issue a license on the ground that the project is not "best adapted to a comprehensive plan for improving or developing" the waterway. *See* 16 U.S.C. § 803(a). Thus, there is no need to believe that Congress intended its words to have anything but their "obvious meaning" in order for the Act to work in conformance with its declared purposes. Where means and ends sing in such harmony, the Commission's false note sounds false indeed.

### B.

To restate our conclusion in the terms of *United Food and Commercial Workers Union,* when examined in light of traditional principles of statutory construction, the Federal Power Act reveals that Congress did not intend to authorize the Commission to displace state tort laws applicable to its licensees. Out of an abundance of caution, we have also consulted the legislative history of that Act in search of any indication

that Congress intended the licensing provisions to carry the unusual implication that the Commission draws from them. Only strong evidence of such intent would be sufficient to overcome the clear meaning of the statute, of course, but in any event we find no such evidence at all. Indeed, to the extent that the history sheds any light on the question before us, it suggests that Congress intended that state law govern damage claims against licensees.

The licensing provisions of Subchapter I of the Federal Power Act are derived from the Federal Water Power Act of 1920, ch. 285, 41 Stat. 1063, the first comprehensive attempt by the federal government to promote the development of power plants on the nation's navigable rivers. *See generally* H.R.Rep. No. 61, 66th Cong., 1st Sess. (1919). As the Supreme Court has noted, the legislative history of this Act "discloses both a vigorous determination of Congress to make progress with the development of the long idle water power resources of the Nation and a determination to avoid unconstitutional invasion of the jurisdiction of the States." *First Iowa Hydro–Electric Cooperative v. FPC,* 328 U.S. 152, 171, 66 S.Ct. 906, 90 L.Ed. 1143 (1946); *see id.* at 174, 66 S.Ct. at 916 (quoting remarks of Rep. William L. LaFollette, 56 Cong.Rec. 9810: "We are earnestly trying not to infringe the rights of the States.").[4]

Not surprisingly, the legislative history of the first sentence of § 10(c), which authorizes the Commission to prescribe rules and regulations for the "protection of life, health and property," contains no discussion of the Commission's authority to displace state laws governing tort liability. To the contrary, the origin of that provision suggests that it was intended only to address the dangers arising from inadequate maintenance and operation of power projects. Section 10(c) was adapted from a draft bill submitted to the House by the

---

**4.** The Senate Committee on Commerce also noted, in reference to an early draft of the Act, that:

[T]he committee is of the opinion that the bill is so framed as to protect and maintain the constitutional power and control of the Federal Government over navigable streams, as well as the sovereignty of the States and the

rights of riparian proprietors over and in the beds and waters of those streams, and allow the full exercise and enjoyment of the latter, subject to the paramount authority of Congress to regulate the same for navigation purposes.

S.Rep. No. 179, 65th Cong., 2d Sess. 4 (1917).

Secretaries of War, of the Interior, and of Agriculture. *See* H.R.Rep. No. 715, 65th Cong., 2d Sess. Exhibit A (1918). Their draft provided that "the licensee shall ... so maintain and operate said works as not ... to constitute a menace to life, health or property." *Id.* at 24. The House Committee on Water Power replaced this language with that of current § 10(c), affirmatively authorizing the Commission to prescribe rules and regulations protecting life, health, and property. *See id.*, Exhibit B at 34. This chain of events implies that Congress granted the Commission the power specified in the first sentence of § 10(c) in order to address the problem identified in the original draft, i.e., power plants that are maintained or operated in a way that menaces safety. Neither the duty to maintain and operate a plant safely nor the power to issue regulations governing maintenance and operation to that end would normally contemplate either an obligation to compensate or the power to create rules of liability.

Further confidence in our interpretation of the Act is available in the legislative history of the second sentence of § 10(c), a provision that specifically addresses the issue of compensation for damages caused by licensees:

> Each licensee hereunder shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto, constructed under the license, and in no event shall the United States be liable therefor.

16 U.S.C. § 803(c). On its face, this provision does not, of course, resolve the question whether the liability of licensees is to be determined according to state or a new federal tort law. Indeed, for this reason, the Commission disclaimed any reliance on this provision in its order denying rehearing. *See* 38 FERC at 61,366–67. We note, however, that most courts to have considered the meaning of § 10(c) have con-

cluded that Congress intended simply to preserve any existing cause of action under state law. *Compare Pike Rapids Power Co. v. Minneapolis, St.P. & S.S.M.R. Co.,* 99 F.2d 902, 911–12 (8th Cir.1938); *Beaunit Corp. v. Alabama Power Co.,* 370 F.Supp. 1044, 1050–51 (N.D.Ala.1973); *Key Sales Co. v. South Carolina Electric & Gas Co.,* 290 F.Supp. 8, 23 (D.S.C.1968), *aff'd,* 422 F.2d 389 (4th Cir.1970) (*per curiam*); *Rice Hope Plantation v. South Carolina Public Service Auth.,* 216 S.C. 500, 59 S.E.2d 132, 140–41 (1950); and *Alabama Power Co. v. Smith,* 229 Ala. 105, 155 So. 601, 604 (1934) *with Seaboard Air Line R.R. Co. v. County of Crisp,* 280 F.2d 873, 875–76 (5th Cir.1960); and *DiLaura v. Power Auth. of State of New York,* 654 F.Supp. 641, 644 (W.D.N.Y.1987).

The legislative history supports this majority view. The original version of § 10(c) reported to the House of Representatives by the Committee on Water Power provided that "[n]o license hereunder shall have the effect of relieving the licensee from liability for any injury or damage occasioned by the construction, maintenance, or operation of said project works; and the United States shall in no event be liable therefor." During the floor debate in the House, Representative Graham of Illinois suggested that the provision be amended to require that, before they began construction, licensees make settlement or compensation for all damages caused by the construction of their projects according to the laws of the state where the project was to be built. *See* 56 Cong.Rec. 9913–14 (Sept. 3, 1918). Although Representative Dempsey objected to the amendment on the ground that it would be impracticable to make the parties settle "in advance before they can know the amount of the settlement," no participant in the floor debate questioned the premise that damages should be determined according to state law. *See id.* Thus, both the Graham amendment, which was accepted, *see* 56 Cong.Rec. 9972 (Sept. 4, 1918),[5] and the

---

5. As passed by the House, § 10(c) provided that "[e]ach license issued hereunder shall contain an express condition that the licensee shall, be-

fore the commencement of the construction of said project works, comply with the laws of the State in which such project works, or any part

language of the original provision demonstrate that the House intended for damages (whether ascertained before or after construction) to be determined in accordance with state law. Nothing in the legislative history indicates that this understanding was ever altered during later discussions of the Act. In particular, while the amendment requiring payment before construction was superceded, in conference with the Senate, by the current language of § 10(c), the Conference Report, H.R. Rep. No. 1147, 65th Cong., 3d Sess. 16 (1919), does not indicate any intention to abandon the principle that property damages caused by licensees should be determined in accordance with state law.

Assuming, as the legislative history suggests we should, that Congress intended for § 10(c) merely to preserve existing state laws governing the damage liability of licensees, it follows that the Commission may not encroach upon this state domain by engrafting its own rules of liability. In particular, the Supreme Court has explicitly warned against interpretations of the Act that establish "futile duplication of two authorities over the same subject matter." *First Iowa,* 328 U.S. at 170, 66 S.Ct. at 914. In *First Iowa Hydro–Electric Cooperative v. FPC,* 328 U.S. 152, 168, 66 S.Ct. 906, 913, 90 L.Ed. 1143 (1946), the Supreme Court observed that

> In the Federal Power Act there is a separation of those subjects which remain under the jurisdiction of the States from those subjects which the Constitution delegates to the United States and over which Congress vests the Federal Power Commission with authority to act. To the extent of this separation, the Act establishes a dual system of control. The duality of control consists merely of the division of the common enterprise between two cooperating agencies of government, each with final authority in its own jurisdiction. The duality does not require two agencies to share in the final decision of the same issue.

thereof, are to be situated, relative to damages that may be caused, directly or indirectly, by

Applying these general principles to the issue before us leads to the conclusion that Congress did not intend for the Commission to "share" in the determination of when licensees would be liable to their neighbors for property damages, a decision which "remain[s] under the jurisdiction of the States."

### III. CONCLUSION

In sum, the clear import of the statute is at one with its legislative history: while the Commission may require its licensees to abide by rules and regulations promoting safety, the liability of those licensees for damages caused by their projects is a matter left by Congress to state law. The Commission therefore exceeded its authority under the Act when it attempted to replace the tort law of South Carolina with its own principle of compensation, which it considered to be the more "fair and equitable." 36 FERC at 61,134.

Having determined that the Commission exceeded its authority, our inquiry is at an end; in particular, we cannot countenance the Commission's contention that the compensation condition was justified merely because the Commission could have ordered the more expensive remedy of replacing the dam. Without this *non sequitur,* there is no need to consider at this time SCPSA's contention that it would be unlawful for the Commission to order replacement of the dam, at a cost of over $500,000,000, in order to protect downstream landowners against potential property damage estimated at only $12,000,000. If the Commission wants to consider the replacement option on remand, it should evaluate this contention in the first instance. Accordingly, the petition for review is

*Granted.*

said proposed project works...." H.R.Conf. Rep. No. 1147, 65th Cong., 3d Sess. 16 (1919).