ORDER
The opinion filed on March 9, 2005, is amended as follows. Part II Section B, labeled “Reserved Water Rights Claim”, is deleted. Part II Section C, labeled “State-Law Claims”, becomes Part II Section B. Part II Section D, labeled “16 U.S.C. § 803(c)”, becomes Part II Section C.
Judge Berzon’s opinion dissenting in part is amended as follows. Footnote 1 of the dissenting opinion is revised to read as follows: “I dissent only from subsection A (“Treaty-Based Claims”) of Part II (“Claims Against the City of Tacoma and Tacoma Public Utilities”) of the majority opinion.” Part III of the dissenting opinion is deleted. The second sentence of the final paragraph of the dissenting opinion, which reads “I also dissent from the grant of summary judgment on the reserved water rights claim,” is deleted.
Appellant Skokomish Indian Tribe’s motion, filed on May 10, 2005, for leave to file a reply to Appellee City of Tacoma’s response to the petition for additional rehearing or full court rehearing en banc is GRANTED. The motion of amici curiae, filed on April 21, 2005, to file a brief supporting the petition for additional rehearing or full court rehearing en banc is GRANTED. The petition for additional rehearing or full court rehearing en banc is DENIED. No further petitions will be accepted.
OPINION
KOZINSKI, Circuit Judge:
Can an Indian tribe bring claims against the United States under the Federal Tort Claims Act for violation of a treaty, or against a city and a public utility under a treaty and 42 U.S.C. § 1983?
FACTS
The Skokomish Indian Tribe (“Tribe”) and its members brought suit in federal district court against the United States, the City of Tacoma (“City”) and Tacoma Public Utilities (“TPU”), alleging harms caused by the Cushman Hydroelectric Project (“Project”), a City-owned project comprised of two dams, two reservoirs, diversion works, two power houses and transmission lines. The Project, completed in 1930, floods over thirty acres 'of federal land in a total project area of 4700 acres located upstream from the Tribe’s land. The Project has diverted the flow of the Skokomish River’s North Fork to power-generating facilities and led to aggradation of the river.[1] This has allegedly caused flooding of. the Tribe’s reservation, failure of septic systems, contamination of water wells, blocking of fish migration, *510 damage to the Tribe’s orchards and pastures and silting over of many of the Tribe’s fisheries and shellfish beaches. The Tribe claims the Project has caused it nearly $5 billion in losses.
The Tribe sued for damages resulting from the Project’s impact on tribal lands and fisheries, alleging both state and federal causes of action, including claims arising under the Treaty of Point No Point (“Treaty”), Jan. 26, 1855, 12 Stat. 933. The Treaty ceded the Tribe’s territory to the United States, but reserved a tract for the Tribe. It also reserved for the Tribe “[t]he right of taking fish at usual and accustomed grounds and stations ... in common with all citizens of the United States” and “the privilege of hunting and gathering roots and berries on open and unclaimed lands.” Id., art. 4.
The district court dismissed the United States as a defendant and granted summary judgment in favor of the City and TPU on the treaty-based and state-law claims. The court also dismissed the Tribe’s claim under 16 U.S.C. § 803(c) for failure to state a claim upon which relief could be granted. A divided panel of our court affirmed, but held that the district court should have dismissed the treaty-based claims for lack of subject matter jurisdiction. We took the case en banc. Skokomish Indian Tribe v. United States, 358 F.3d 1180, 1181 (9th Cir.2004).
ANALYSIS
I. Claims Against the United States

A. Treaty-Based Claims

The Tribe seeks relief against the United States pursuant to the Federal Tort Claims Act (“FTCA”), 28 U.S.C. § 1346. The Tribe alleges that the United States violated its obligations under the Treaty by allowing continued operations of the Project and by failing to take legal action on the Tribe’s behalf or fund litigation, thereby breaching its fiduciary responsibilities to the Tribe under the Treaty.
These claims are not properly brought under the FTCA, which authorizes suits against the United States
for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.
28 U.S.C. § 1346(b)(1) (emphasis added).[2] The Tribe’s claims against the United States are properly characterized not as tort claims, but as claims that the United States violated its obligations under the Treaty. The claims are thus quite different from those in eases like Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), and Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), on which the Tribe relies. In Berkovitz, a federal agency allegedly acted tortiously in approving the release of a polio vaccine that did not meet safety standards. In Indian Towing, the Coast Guard acted negligently in its operation of a lighthouse because it did not “use due care to make certain that the light was kept in good working order,” *511 causing more than $60,000 in damages to a barge and its cargo. 350 U.S. at 69, 76 S.Ct. 122. The Tribe is not claiming the United States behaved tortiously, but rather that the United States failed to abide by its contractual obligations to the Tribe under the Treaty.
The Tribe’s claims may best be characterized as arising under the Tucker Act, 28 U.S.C. § 1491, or its counterpart for Indian claims, the Indian Tucker Act, 28 U.S.C. § 1505. The Tucker Act gives the Court of Federal Claims exclusive jurisdiction over claims for damages exceeding $10,000 that are “founded ... upon any express or implied contract with the United States.” 28 U.S.C. § 1491(a)(1). The Indian Tucker Act extends the Court of Federal Claims’ jurisdiction to
any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group.
28 U.S.C. § 1505.[3] It is under the Tucker and Indian Tucker Acts that the federal courts have considered claims most similar to those of the Tribe. For example, in United States v. Mitchell (Mitchell II), 463 U.S. 206, 208, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), an Indian tribe brought a Tucker Act cause of action in the Court of Claims (the Court of Federal Claims’ predecessor) against the United States for breach of trust responsibilities that originated with a treaty, which was later codified in federal law. This is very much like our case, in which the Tribe’s claims against the United States are for breach of its fiduciary obligations under the Treaty.
Because we lack subject matter jurisdiction over the Tribe’s damages claims against the United States, but believe they might properly have been brought under the Indian Tucker Act, we exercise our discretion to transfer these claims to the Court of Federal Claims. See 28 U.S.C. § 1631 (“Whenever ... an appeal, including a petition for review of administrative action, is noticed for or filed with ... a court and that court finds that there is .a want of jurisdiction, the court shall, if it is in the-interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed .... ”); Beck v. Atl. Richfield Co., 62 F.3d 1240, 1242 n. 4 (9th Cir.1995) (per curiam).

B. Federal Power Act Claims

The Tribe also asserts the United States violated the Federal Power Act (FPA), 16 U.S.C. §§ 791a-828c, by failing to submit and include license conditions protective of the Skokomish Reservation fish and wildlife, to fully consider environmental factors before issuing a project license, and to require evidence that the City, as a license applicant, possessed sufficient water rights for the Project and complied with state and federal laws requiring fishways at dams and prohibiting impairment of navigation. The FPA, however, specifically provides: “Each licensee hereunder shall be liable for all damages occasioned to the property of others by the *512 construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto, constructed under the license, and in no event shall the United States be liable therefor.” 16 U.S.C. § 803(c) (emphasis added).
The plain language of the FPA is clear. It differentiates between the United States and licensees, and unequivocally exempts the United States from liability. When the statutory language is clear, it trumps. Lamie v. United States Tr., 540 U.S. 526, 124 S.Ct. 1023, 1030, 157 L.Ed.2d 1024 (2004). We therefore affirm the district court’s dismissal of all FPA claims against the United States.
II. Claims Against the City of Tacoma and Tacoma Public Utilities

A. Treaty-Based Claims 
[4]

1. A treaty between the United States and an Indian tribe “is essentially a contract between two sovereign nations.” Washington v. Wash. State Commercial Passenger Fishing Vessel Ass’n, 443 U.S. 658, 675, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) (Fishing Vessel). Nonetheless, treaties constitute the “supreme law of the land,” Breard v. Greene, 523 U.S. 371, 376, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998) (per curiam), and they have occasionally been found to provide rights of action for equitable relief against non-contracting parties, see United States v. Winans, 198 U.S. 371, 377, 25 S.Ct. 662, 49 L.Ed. 1089 (1905).
Equitable relief, however, merely ensures compliance with a treaty; that is, it forces state governmental entities and their officers to conform their conduct to federal law. The Tribe here would have us go further and hold that it may recover monetary damages against the City and TPU for alleged treaty violations. We find no basis for doing so.[5]
*513 The Supreme Court has held that the Treaty of Point No Point and similar treaties are “self-enforcing” and thus do not require implementing legislation to form the basis of a lawsuit. See Fishing Vessel, 443 U.S. at 693 n. 33, 99 S.Ct. 3055. To make this determination, the Court looked at language common to the treaties, which stated that the treaties “shall be obligatory on the contracting parties as soon as [they are] ratified by the President and Senate of the United States.” Id. (emphasis added) (alteration in original) (internal quotation marks omitted); see also Treaty, art. 14. However, the City and TPU are not contracting parties to the Treaty. Nor is there anything in the language of the Treaty that would support a claim for damages against a non-contracting party. Cf. Alexander v. Sandoval, 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (“The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.”); Touche Ross & Co. v. Redington, 442 U.S. 560, 568, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) (“[O]ur task is limited solely to determining whether Congress intended to create the private right of action asserted.... And as with any case involving the interpretation of a statute, our analysis must begin with the language of the statute itself”).
The Tribe has argued that in Fishing Vessel and Puyallup Tribe v. Department of Game of Washington (Puyallup I.), 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968), the Supreme Court held that tribes may have a cause of action against non-contracting parties under a treaty, even in the absence of a specific treaty provision. But the Tribe misunderstands the significance of those cases. In Fishing Vessel, the Court interpreted a group of treaties, including the one at. issue here, which granted Indian tribes “ ‘[t]he right of taking fish, at all usual and accustomed grounds and stations ... in common with all citizens....’ ” 443 U.S. at 674, 99 S.Ct. 3055 (quoting Treaty of Medicine Creek, Dec. 26, 1854, art. 3, 10 Stat. 1132, substantially similar to Treaty of Point No Point, art. 4). The Court held that this provision secured to the tribes the right to harvest a share of each run of anadromous fish that passed through tribal fishing areas and not merely a right to compete with non-treaty fishermen on an equal basis. Id. at 683-85, 99 S.Ct. 3055. The tribes were thus entitled to an equal, measure of the harvestable portion of each run that passed through a “usual and accustomed” tribal fishing ground, adjusted downward if tribal needs could be satisfied by a lesser amount. Id. at 685-89, 99 S.Ct. 3055.
The Court then held that its order was enforceable by injunction. See id., at 692 n. 32, 99 S.Ct. 3055. This is quite different from finding a right to sue a non-contracting party for damages under a treaty — a theory the Supreme Court avoided in Fishing Vessel.
Puyallup I is not to the contrary. In that case, the Court held that the State of Washington — a non-party to a treaty between the Puyallup Tribe and the United States — could regulate the modes of fishing allowed as an appropriate exercise of the State’s police power because ‘.‘the manner in which the fishing may be done and its purpose ... are not mentioned in the Treaty.” 391 U.S. at 398, 88 S.Ct. 1725. The Court suggested that, even though the *514 state could regulate in this instance, -it could not pass legislation that would directly interfere with rights secured by a treaty. See id. (“We would have quite a different case if the Treaty had preserved the right to fish at the ‘usual and accustomed places’ in the ‘usual and accustomed’ manner.”). But the Court did not hold that the Tribe had a private right of action under the Treaty for damages. In fact, the Puyallup Tribe did not bring a claim at all. It was the State of Washington that had sued the Tribe, seeking an injunction and declaratory relief that would allow the State to regulate certain fishing areas named in the Treaty. The Court did not consider whether the Tribe had a right of action even for -equitable relief, let alone monetary damages' going back nearly seventy-five years.
The Tribe gets no help from Antoine v. Washington, 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975). Antoine stands for the proposition that when a treaty has been implemented by Congress, “neither an express provision precluding state qualification nor the consent of the State [is] required” to subject a state to the provisions of the treaty. Id. at 205, 95 S.Ct. 944. Holding that a state is precluded from passing laws inconsistent with a treaty is quite different from saying that a non-contracting party can be sued for damages under the treaty.
Finally, County of Oneida v. Oneida Indian Nation, 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) (County of Oneida II), is inapposite. In that case, the Supreme Court found that the plaintiff tribes could assert a federal common law damages claim for unlawful possession of land. The Court’s decision was not based on any treaty. Rather, it was based on well-established federal common law principles regarding aboriginal possessory rights in land. See id. at 235-36, 105 S.Ct. 1245. By contrast, the Tribe in our case is seeking to collect damages for violation of fishing rights reserved to it by treaty.
Thus, we hold that there is no basis for implying the right of action for damages that the Tribe seeks to assert.
2. We turn next to the Tribe’s claims under 42 U.S.C. § 1983. The Supreme Court recently held in Inyo County v. Paiute-Shoshone Indians, 538 U.S. 701, 708-12, 123 S.Ct. 1887, 155 L.Ed.2d 933 (2003), that a Tribe is not a “person” capable of bringing a claim under section 1983 for violation of a sovereign prerogative. The Court reasoned that “qualification of a sovereign as a ‘person’ who may maintain a particular claim for relief depends ... on the ‘legislative environment’ in which the word appears.” Id. at 711, 123 S.Ct. 1887 (quoting Georgia v. Evans, 316 U.S. 159, 161, 62 S.Ct. 972, 86 L.Ed. 1346 (1942)). To illustrate circumstances in which sovereigns may assert claims under section 1983, the Court cited Evans, in which “a State, as purchaser of asphalt shipped in interstate commerce, qualified as a ‘person’ entitled to seek redress under the Sherman Act for restraint of trade.” Inyo County,. 538 U.S. at 711, 123 S.Ct. 1887 (citing Evans, 316 U.S. at 160-63, 62 S.Ct. 972). It also cited Pfizer, Inc. v. Government of India, 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978), which “held that a foreign nation, as purchaser of antibiotics, ranked as a ‘person’ qualified to sue pharmaceuticals manufacturers under our antitrust laws.” 538 U.S. at 711, 123 S.Ct. 1887 (citing Pfizer, 434 U.S. at 309-20, 98 S.Ct. 584).
The Tribe here is not suing as an aggrieved purchaser, or in any other capacity resembling a “private person[].” Id. at 712, 123 S.Ct. 1887. Rather, the Tribe is attempting to assert communal fishing rights reserved to it, as a sovereign, by a treaty it entered into with the United *515 States. See United States v. Washington, 520 F.2d 676, 688 (9th Cir.1975) (“The treaties must be viewed as agreements between independent and sovereign nations. ... Each tribe bargained as an entity for rights which were to be enjoyed communally.”). Recognizing that “[s]ection 1983 was designed to secure private rights against government encroachment,” id. at 712, as well as the “longstanding interpretive presumption that ‘person’ does not include the sovereign,” Vt. Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 780, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000), we conclude that the Tribe may not assert its treaty-based fishing rights under section 1983.[6]
As for the individual members of the Tribe, while we have suggested that some treaty-based rights might be cognizable on behalf of a tribe’s members under section 1983, see United States v. Washington, 813 F.2d 1020, 1023 (9th Cir.1987), we have noted that the hallmark for determining the scope of section 1983 coverage is whether the right asserted “is one ‘that protects the individual against government intrusion,’ ” Hoopa Valley Tribe v. Nevins, 881 F.2d 657, 662 (9th Cir.1989) (quoting White Mountain Apache Tribe v. Williams, 810 F.2d 844, 848, (9th Cir.1987)). In Hoopa Valley, for instance, we held that section 1983 could not be used to enforce a collective right to tribal self-government.
The Tribe’s treaty-based rights do not give rise to individual actions cognizable under section 1983. As we stated in Settler v. Lameer, 507 F.2d 231, 237 (9th Cir.1974), with regard to fishing rights similar to those that the Tribe’s members assert here, “the fishing rights reserved in [the relevant treaty] are communal rights of the Tribe, even though the individual members benefit from those rights.” See also Whitefoot v. United States, 155 Ct.Cl. 127, 293 F.2d 658, 663 (1961) (noting that “interests in ... fisheries are communal, subject to tribal regulation”).[7] Because *516 the Tribe’s members seek to vindicate communal, rather than individual rights, they do not have cognizable section 1983 claims against the City or TPU.[8]
We therefore affirm the district court’s grant of summary judgment in favor of the City and TPU. The Tribe’s claims cannot be asserted under' the Treaty or under section 1983.

B. State-Law Claims

The Tribe brought a series of state-law claims against the City and TPU based on the property damage resulting from aggradation of the Skokomish River. The claims included inverse condemnation, trespass, tortious interference with property, conversion, negligence, negligent misrepresentation, private and public nuisance, and violation of Washington Revised Code section 4.24.630, which prohibits persons from going onto the land of another and wrongfully causing waste or injury to the land or to personal property. We find that all of the Tribe’s state-law claims are barred by the applicable statutes of limitations.
Under Washington law, the statute of limitations for inverse condemnation is ten years. Highline Sch. Dist. No. 401 v. Port of Seattle, 87 Wash.2d 6, 548 P.2d 1085, 1089 (1976). The statutes of limitations for trespass, negligence, conversion, tortious interference, nuisance and actions under Washington Revised Code section 4.24.630 are three years. See Wash. Rev. Code § 4.16.080.[9]
*517 The district court found that the Tribe’s aggradation-related claims began to accrue no later than February 16, 1989. On that date, Russell Busch, then attorney for the Tribe, wrote a letter to Gary Hansen at the Washington Department of Ecology, stating:
Please consider this letter both a formal protest and an intergovernmental comment by the Skokomish Indian Tribe with regard to the referenced water rights Applications for Permit and any other water use authorizations sought by the City of Tacoma in .the Skokomish River Basin.
The Skokomish Tribe resides upon a federal Indian Reservation on the Skokomish River downstream from the Applicant’s [City of Tacoma] diversions and impoundments. It is the position of the Tribe that Applicant’s actions reduce the natural flow of the river in such a way that: (1) Indian treaty fisheries are seriously reduced both on the Reservation and at other usual and accustomed places, in violation of the Treaty of Point No Point; (2) the federal reserved water rights of the Skokomish Reservation are unlawfully interfered with; and (3) the reduction of tributary inflow caused by Tacoma’s impoundments and diversions is a direct and proximate cause of channel aggradation' and flooding on [and] above the reservation.
Supp. E.R. at 408.
We agree with the district court that this was the applicable' date of accrual. Though the Tribe argues that this is a factual issue that should have been submitted to' the jury, where there is clear evidence of when the claims accrued, the *518 court may make this determination. See Reichelt v. Johns-Manville Corp., 107 Wash.2d 761, 733 P.2d 530, 535-36 (1987); Fradkin v. Northshore Util. Dist., 96 Wash.App. 118, 977 P.2d 1265, 1268 (1999). To start the statute of limitations running in Washington, all that is required is:
[W]hen a plaintiff is placed on notice by some appreciable harm occasioned by another’s wrongful conduct, the plaintiff must make further diligent inquiry to ascertain the scope of actual harm. The plaintiff is charged with what a reasonable inquiry would have discovered. Stated more succinctly, the law does not require a smoking gun in order for the statute of limitations to commence.
Giraud v. Quincy Farm & Chem., 102 Wash.App. 443, 6 P.3d 104, 109 (2000) (internal quotation marks and citations omitted). Busch’s “formal protest” of the Project in 1989 is sufficient to meet this standard. Thus, because the Tribe did not file its complaint until November 19, 1999, more than ten years after its aggradation-related claims accrued, its claims are time-barred.
There is an exception to the statute of limitations for certain trespass claims. Where a plaintiff can show that its claim is a “continuing” violation, “the statute of limitation serves only to limit damages to those incurred in the three-year period before the suit was filed.” Fradkin, 977 P.2d at 1267. To show a continuing violation, the plaintiff must demonstrate that the damage is “reasonably abatable,” id., which means that “[t]he condition ... can be removed ‘without unreasonable hardship and expense,’ ” id. at 1270 n. 25 (quoting Mangini v. Aerojet-Gen. Corp., 12 Cal.4th 1087, 51 Cal.Rptr.2d 272, 912 P.2d 1220, 1225 (1996)). It is the plaintiffs burden to prove reasonable abat-ability. See Mangini, 51 Cal.Rptr.2d 272, 912 P.2d at 1225-26.
The district court held that the Tribe’s alleged damages were not reasonably abatable, precluding a finding of a continuing violation. The Tribe’s expert estimated the value of the Tribe’s property before the damage at $2,170,040. Supp. E.R. at 410, 421. The same expert estimated the total remediation cost at $3,770,500. Id. Given this large discrepancy between the cost of repair and the actual value of the land, it is clear that the damages could be abated only with unreasonable hardship and expense.[10] The district court correctly concluded that there was no continuing violation.

C. 16 U.S.C. § 803(c)

The Tribe also claims the City and TPU violated 16 U.S.C. § 803(c), which requires licensees to maintain project works in a condition so as not to impair navigation. Section 803(c) provides that “[e]ach licensee hereunder shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto, constructed under the license, and in no event shall the United States be liable therefor.”
*519 The district court dismissed for failure to state a claim upon which relief could be granted, holding that section 808(c) does not provide a private right of action. This follows the Second Circuit’s decision in DiLaura v. Power Authority of State of N.Y., 982 F.2d 73 (2d Cir.1992), and the D.C. Circuit’s decision in South Carolina Public Service Authority v. FERC, 850 F.2d 788 (D.C.Cir.1988).
DiLaura and South Carolina Public Service Authority held that section 803(c) does not create a federal private right of action, but instead preserves only existing state-law claims against licensees. DiLaura, 982 F.2d at 77-79; S.C. Pub. Serv. Auth., 850 F.2d at 793-95. Their holdings were based on a reading of the statute as well as its legislative history. The legislative history revealed that all discussion during the floor debates centered on the premise that “damages caused by licensees should be determined in accordance with, state law.” Id. at 795. As the D.C. Circuit explained, since “Congress intended for [the statute] merely to preserve existing state laws governing the damage liability of licensees, it follows that the Commission may not encroach upon this state domain by engrafting its own rules of liability.” Id. We believe this interpretation of section 803(c) is the correct one and thus see no cause for parting company with our sister circuits. We affirm the district court’s dismissal of the Tribe’s section 803(c) claim.
III. Recusal Motion
The Tribe also appeals the district court’s denial of its motion to disqualify the district judge. Sixteen months after filing its complaint, and after the district court had already ruled on a number of claims, the Tribe asserted that Judge Burgess had an obligation to recuse himself because he was a utility customer, and the outcome of the case might substantially affect his utility bill. Judge Burgess denied the motion, finding it untimely. The Tribe moved for reconsideration, and Judge Burgess again denied recusal. Judge Burgess then referred the motion to Chief District Judge Coughenour, who also held it was untimely, because Judge Burgess had already ruled on at least fifteen different motions and trial was less than five months away.
A motion for recusal must be made with “reasonable promptness after the ground for such a motion is ascertained.” Preston v. United States, 923 F.2d 731, 733 (9th Cir.1991); see also Wood v. McEwen, 644 F.2d 797, 802 (9th Cir.1981) (per curiam) (waiting sixteen months- after discovering the grounds for recusal was untimely and resulted in a waiver). The Tribe knew it was litigating a case against .TPU in Tacoma federal court, before a Tacoma-area judge. It should have known when it filed its complaint that it might want to seek recusal of the judge assigned to the matter. -At the very least, the Tribe admits that it believed it had grounds for recusal at least seven months before filing the motion. The district court thus did not abuse its discretion in denying the recusal motion. See Kulas v. Flores, 255 F.3d 780, 783 (9th Cir.2001).[11]
IV. Class Certification
Because-we affirm-the district court, we need not address the district court’s denial of class certification. See Alexander v. Whitman, 114 F.3d 1392, 1398 n. 7 (3d Cir.1997) -(because the court held that dismissal of the complaint was proper, it did *520 not need to address the propriety of the district court’s denial of plaintiffs’ motion for class certification).
AFFIRMED IN PART AND TRANSFERRED TO THE COURT OF FEDERAL CLAIMS IN PART.

. Aggradation occurs when deposits of sediment cause the floor of the river to build up over time, leading to flooding and elevated water tables.

. The FTCA also requires plaintiffs to exhaust their administrative remedies before bringing suit. See McNeil v. United States, 508 U.S. 106, 112, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993). The Tribe met this requirement by filing an administrative claim for damages on September 22, 1997, which was rejected on November 20, 1997. See Amended Complaint at 32.

. The Indian Tucker Act is identical to the Tucker Act, except that it specifies Indian tribes as eligible claimants. The Indian Tucker Act was passed because there had been considerable doubt as to whether the Tucker Act applied to Indian tribes. See Gregory C. Sisk, Yesterday and Today: Of Indians, Breach of Trust, Money, and Sovereign Immunity, 39 Tulsa L.Rev. 313, 316 (2003).

. We reject defendants’ contention that the FPA preempts the Tribe’s treaty-based damages claims against the City and TPU. Defendants’ argument is based on the fact that in 1924, the City received a license from the Federal Power Commission (FPC) authorizing the flooding of 8.8 acres of federal land that would result from the Project. See City of Tacoma, 67 F.E.R.C. ¶ 61,152, at 61,440, 1994 WL 170164 (1994). Defendants assert that the Tribe's treaty-based claims are actually collateral attacks on the licensing decision, which are governed by the FPA and which the district court lacked subject matter jurisdiction to consider. See 16 U.S.C. § 8251(b).
The 1924 license was a narrow "minor part” license, applying by its terms only to "the occupancy and use of a tract of land approximately 8.8 acres in area ... said land constituting a minor part of said power project.” As the Federal Energy Regulatory Commission. — the FPC's successor — has recognized, the license did not "authorize the construction, operation, and maintenance of the Cushman Project.” City of Tacoma, 67 F.E.R.C. at ¶ 61,440.
It is true that the FPA "provides exclusive jurisdiction for the Courts of Appeals to review and make substantive modifications to FERC licensing orders.” Cal. Save Our Streams Council, Inc. v. Yeutter, 887 F.2d 908, 911 (9th Cir.1989). But the Tribe is not attempting to collaterally attack the 1924 licensing decision; rather, it is suing for damages based on impacts that are not covered by the license. The FPA does not preempt the Tribe’s treaty-based claims.

. Judge Berzon's dissent misreads our opinion as assuming that "the cases upholding causes of action for violation of Indian treaty rights but providing only equitable relief implicitly held that damages are not available.” Berzon dissent at 526. We find only that those cases did not recognize an implied right of action for damages, and that there are no grounds for inferring that the parties to the Treaty intended to create such an action. Cf. Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 284, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (stating that courts implying rights of action "have a measure of latitude to shape a sensible remedial scheme that best comports” with the relevant enactment).
Similarly mistaken is the dissent’s description of our opinion as holding that "Indian tribes and their members cannot, under feder *513 al law, sue municipalities for damages for violation of rights secured by Indian treaties.” Berzon dissent at 522. We analyze a specific set of claims brought under a specific treaty, and we thus have no occasion to consider whether different rights of action might be implied from other treaties.

. In her dissent, Judge Berzon relies on United States v. Washington, 935 F.2d 1059 (9th Cir.1991) (Washington II). Berzon dissent at 529-30. But in that case we ruled only that lower courts must distinguish "between litigation defining and enforcing” treaty rights in determining whether attorney’s fees should be awarded under 42 U.S.C. § 1988. Id. at 1061. We did not consider, let alone resolve, whether Indian tribes may properly sue as “persons” under section 1983 for violation of treaty-based rights; the question does not appear to have been raised.

. Judge Berzon disagrees with our conclusion in significant part based on Kimball v. Callahan, 590 F.2d 768 (9th Cir.1979) (Kimball II), where we reaffirmed our prior holding in Kimball v. Callahan, 493 F.2d 564 (9th Cir.1974) (Kimball I), that an individual Indian "possessing treaty rights to hunt, fish, and trap” on a former reservation "retained those rights even though he relinquished his tribal membership pursuant to” a tribal termination act. Kimball II, 590 F.2d at 772. As the dissent concedes, however, the Kimball cases "did not involve a suit brought under § 1983.” Berzon dissent at 530. Moreover, the cases dealt with the rights of individual Indians after their tribe was terminated. Indeed, we expressly distinguished Washington, 520 F.2d at 688, and Whitefoot, 293 F.2d at 663, on the ground that "[n]either of these cases ... was concerned, as was Kimball I, with the tribal rights of individual Indians upon the termination of a tribe.” Kimball II, 590 F.2d at 772.' Our case likewise does not involve claims made by individual Indians after the tribal entity has been terminated.
Kimball II further limited Kimball I by noting that “the court’s statement [in Kimball /] that treaty rights to hunt and fish are rights of the individual Indian must be understood within the context of the two cases cited in its support.” Id. at 772-73 (footnote omitted). The first of these cases, McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), "involved] the narrow question whether the State may tax a reservation Indian for income earned exclusively on .the reservation,” id. at 168, 93 S.Ct. 1257, and was based on the general policy of "leaving Indians free from *516 state jurisdiction and control,” id. (quoting Rice v. Olson, 324 U.S. 786, 789, 65 S.Ct. 989, 89 L.Ed. 1367 (1945)) (internal quotation marks omitted). The second, Mason v. Sams, 5 F.2d 255 (W.D.Wash.1925), dealt with whether “the Commissioner of Indian Affairs could enforce regulations made by him without tribal consent which required [tribe members] to pay a royalty for the fish they caught in reservation streams to be used by the Tribe for the care of the aged and destitute members of the Tribe and for general agency purposes.” Kimball II, 590 F.2d at 773. Here, by .contrast, the Tribe’s members are not attempting to challenge governmental regulation of individual Indians. Our opinions in Kimball I and Kimball II, then, provide little guidance.

. The Tribe argues that section 1983 protects communal rights. But the cases on which the Tribe relies do not support its position. In Romero v. Kitsap County, 931 F.2d 624 (9th Cir.1991), we acknowledged that section 1983 claims for deprivations of treaty rights may be cognizable "under specified circumstances,” id. at 627 n. 5 (citing Hoopa Valley, 881 F.2d at 661-63), but we offered no additional insight into the issue. Romero itself was brought by, among others, individual tribal members who were arrested for gathering shellfish in areas they claimed were treaty-protected. The individuals brought suit under section 1983 against the officers who arrested them. This was a traditional section 1983 suit for unlawful arrest, clearly distinguishable from our case.
Similarly, Shoshone-Bannock Tribes v. Fish & Game Commission, 42 F.3d 1278 (9th Cir.1994), addressed whether the plaintiff actually intended to sue officers of the Idaho Fish and Game Commission in their individual capacities under section 1983. See id. at 1284-85. Following a close textual analysis of the complaint, we held that it did name one officer in his individual capacity, alleging violations of the Due Process and Equal Protection Clauses, as well as treaty rights. We did not consider when a section 1983 claim could be brought to vindicate treaty rights.

. The Tribe argues that the Indian Claims Limitation Act of 1982 (“ICLA”), 28 U.S.C. § 2415, preserves the Tribe’s aggradation-related claims. Under the ICLA, claims brought by Indian tribes are subject to a six-year and ninety-day statute of limitations, unless preserved by publication in the Federal Register. Any cause of action not published in the Federal Register is barred sixty days after the date of publication. Id. Claims included on the list are not barred until after the Secretary of the Department of the Interior either (1) publishes in the Federal Register a notice of rejection of the claim, and a complaint is not filed by the claimant within one year of the Federal Register notice; or (2) submits a *517 legislative proposal to Congress, in which case any right of action on that claim is barred unless the claimant files a complaint within three years of the submission to Congress. Id. "So long as a listed claim is neither acted upon nor formally rejected by the Secretary, it remains live.” County of Oneida II, 470 U.S. at 243, 105 S.Ct. 1245.
The ICLA does not apply to state-law claims, as the Tribe conceded at argument. Instead, we apply state statutes of limitations to state-law claims. See Nev. Power Co. v. Monsanto Co., 955 F.2d 1304, 1306 (9th Cir.1992). But even if the ICLA were to apply, the Tribe's state-law claims are distinct from the preserved fishery claims. The Tribe preserved claims relating to "fishery” damage caused by the Cushman Dam. Though there is not much evidence in the record detailing the preserved claims, the Solicitor of the Department of the Interior described them as based on " [destruction of fishery by diversion of water for hydroelectric project on North Fork River.” Supp. E.R. at 404K. In a letter submitted to Congress urging an extension of the statute of limitations, the Tribe described its preserved claims as follows:
The first case is a major fisheries damage claim against the City of Tacoma. During the 1920's, the City of Tacoma constructed a complex of two high dams on the North Fork of the Skokomish River, thus diverting . its entire flow to power generating facilities located on the Skokomish Indian Reservation .... The diversion .... destroyed the most significant fish producing stream of the Skokomish River system and its excellent runs of salmon and steelhead.
Supp. E.R. at 406-07.
The state-law claims concern the effect of aggradation on tribal property, whereas the preserved claims center around the diversion of water and loss of fish. The Tribe itself admits that it did not know about the aggradation-related damage when it listed its claims under the ICLA in the early 1980s. See Appellant's Opening Br. at 40. Though the Tribe urges us to construe its preserved claims liberally to include aggradation-related damages, see id. (citing Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985)), the requirement that we interpret statutes and treaties broadly in favor of Indian tribes cannot be extended to reach cases where a particular interpretation could not have been contemplated by the parties. Thus, even if the ICLA were applicable, it would not extend any of the Tribe's state-law claims.

. In her dissent, Judge Graber relies on the license that FERC issued to the City in 1998, which directed the City to file a plan for “enhancing the channel conveyance capacity of the mainstem Skokomish River.” See E.R. at 177; Graber dissent at 520-21. But the license states only that the cost of financing the plan may be no more than $5 million, and the Tribe offers no reason to think the actual cost of abatement would be materially less than this maximum. As for Judge Graber's reliance on the possibility that the cost of abatement might "perhaps” be lower than the remediation cost estimates offered by the Tribe, see Graber dissent at 521, the Tribe cannot overcome defendants' motion for summary judgment on the basis of such conjecture.

. We do not, of course, express a view as to the merits of the recusal motion; nothing we say should be read as implying that a timely motion would have been successful.